**WALKER INSURANCE SERVICES,**
Appellant,

v.

**BOTTLE ROCK POWER
CORPORATION,**
Appellee.

No. 14–02–00626–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 29, 2003.

---

Terry B. Joseph, Montgomery, for appellant.

Kirkland A. Fulk, Houston, for appellee.

Panel consists of Justices ANDERSON, SEYMORE, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

Appellant Walker Insurance Services challenges the trial court's order granting appellee Bottle Rock Power Corporation's special appearance. In two points of error, appellant contends that the trial court erred because the evidence was legally and factually insufficient to support the trial court's order. We reverse and remand.

### I. FACTUAL BACKGROUND

Bottle Rock, a California corporation, entered into an agreement with the California Department of Water Resources for

the purchase of the Bottle Rock power plant. The contract contained a number of conditions, including acquisition of a $5 million decommissioning and reclamation bond, a prerequisite to the purchase. Throughout the summer of 2001, Bottle Rock sought the services of several bond companies.

Appellant, a Texas-based independent insurance examiner, became involved in the transaction when its Houston agent, James Walker, met Arlie Beane, also a Texas resident. Walker learned through Beane that Bottle Rock was seeking the bond and agreed to assist in its acquisition. At the special appearance hearing, Walker testified that his understanding of the arrangement was to:

> Get it done—get it done no matter what you have to do as far as get—helping us to get this bond in place because we're under a tight, very tight time constraint; we need to have this in place to finalize the deal or the deal may not be there to finalize. So, whatever you can do, just get it done.

Further, Walker testified that Bottle Rock, through Beane, offered him a hundred thousand dollar incentive fee to acquire the bond under specific time constraints. This alleged oral agreement forms the basis of appellant's lawsuit.

To acquire the bond, Walker approached appellant's broker in Boston, Associated Insurance Agency, Inc. Walker's contact at Associated for this transaction was Terry Smith. Walker also contacted James Hagan, Bottle Rock's California attorney. Hagan had incorporated the Bottle Rock Power Corporation and represented Bottle Rock in its agreement with the Department of Water Resources. At the special appearance hearing, Hagan recalled his first interaction with Walker as follows:

I believe Mr. Walker and I talked by telephone sometime in July, I think. I think Mr. Walker called me one day and asked me some questions about Bottle Rock Power Corporation because he said he had been approached and— about the bond. And I gave him the information that he had requested with respect to the Bottle Rock Power Corporation.

Hagan stated he began to work with Smith on or about August 20, 2001. According to Hagan, he worked primarily with Smith at Associated and also addressed with him "all the important aspects of the bond." When asked how he first came to work with Smith, Hagan recalled that he had been "directed to call" Smith, and Hagan also recalled "some telephone conversation[s] with Mr. Walker prior to the time [he] spoke with Mr. Smith." When specifically asked who referred him to Smith, Hagan stated:

> I'm trying to remember that. It was—I can't remember it clearly. It would have been one of three people. It would have been either—Mr. Walker might have called me and told me to contact Mr. Smith—

Hagan also admitted that it could have been Beane.

Associated required that the $125,000 bond premium be deposited in its bank account or otherwise under its control before issuance of the bond. The contract with the Department of Water Resources was to be executed on August 21, but Bottle Rock missed that deadline because the bond was not yet in place. The next day, to expedite the bond's release, Hagan deposited a certified check for the premium in Walker's bank account.[1] As soon as Smith and Walker received confirmation of the deposit, Smith sent the Department a

---

1. The deposit was made at a California branch of Walker's bank.

letter stating that the bond had been issued. In all, Walker estimated he spent eight to ten weeks negotiating and preparing the transaction before it came to fruition in August of that year.

Walker and Hagan gave conflicting testimony as to Beane's role in the transaction. Walker testified he had never previously met Beane, nor had he known or heard of Bottle Rock prior to the bond transaction at issue and stated that his contact at all relevant times had been Beane, whom he referred to as the "point man." Although Walker testified that he communicated with Hagan, Ronald Suess (the president and a director of Bottle Rock), and Jimmy Wynmiller (a director of Bottle Rock), he stated that "by far" he had worked with Beane most of the time. In his affidavit attached to "Plaintiff's Response to Defendant's Special Appearance," Walker stated that Beane had "spent two full days" in his office "while we worked to get the bond needed by Bottle Rock, and Mr. Beane called me very frequently in working on behalf of Bottle Rock."

According to Hagan, however, Beane was not and had never been an agent of Bottle Rock. When asked who had first approached Walker about the bond, Hagan testified he thought it had been Beane. However, Hagan also testified that no one had ever called him to inquire as to Beane's authority and that he was unaware of any representations made by Beane with respect to the alleged $100,000 fee. Hagan stated that the first he heard of such a

fee was thirty to sixty days after the issuance of the bond when he received a call from Walker. When the fee was not paid, Walker instituted the underlying suit.

Bottle Rock filed a special appearance, which the trial court granted on June 10, 2002.

## II. DISCUSSION

### A. Personal Jurisdiction over Nonresident Defendants

■ Texas courts may exercise jurisdiction over a nonresident if two conditions are satisfied: (1) the Texas long-arm statute authorizes the exercise of personal jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process. *See Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). The Texas long-arm statute authorizes the exercise of jurisdiction over a nonresident defendant who does business in Texas. *See* TEX. CIV. PRAC. & REM.CODE § 17.042 (Vernon 1997);[2] *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). The Texas Supreme Court has interpreted the broad language of the Texas long arm statute to extend Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002) (citing *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex. 1977)) (noting that "the reach of [the Texas long arm statute] is limited only by the United States Constitution"). As a result,

**2.** Under section 17.042, a nonresident conducts acts constituting business in this state if he:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a tort in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

TEX. CIV. PRAC. & REM.CODE § 17.042. Although enumerating particular acts which constitute "doing business," the statute also provides that a nonresident's "other acts" may satisfy that requirement. *Id.*

we consider only whether it is consistent with federal constitutional requirements of due process for Texas courts to assert in personam jurisdiction over Bottle Rock. *Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991).

 Federal constitutional requirements of due process limit the state's power to assert personal jurisdiction over nonresident defendants. *Id.* Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Marchand*, 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. In this case, only specific jurisdiction is alleged.[3] *Id.; see also Schlobohm*, 784 S.W.2d at 358.

 Recently, this court observed "[s]pecific jurisdiction is established when the plaintiff's cause of action arises out of or relates to the defendant's contacts with the forum state. The defendant's activities must have been purposefully directed toward the forum state." *Experimental Aircraft Ass'n v. Doctor*, 76 S.W.3d 496, 504 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (citations omitted). When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *See Guardian Royal*, 815 S.W.2d at 228. We must determine whether the nonresident defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State," invoking the benefits and protections of the state's laws. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Reyes v. Marine Drilling Cos.*, 944 S.W.2d 401, 404 (Tex. App.-Houston [14th Dist.] 1997, no writ) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). A nonresident defendant that purposefully avails itself of the privileges and benefits of conducting business in the forum state has sufficient contacts with the forum to confer personal jurisdiction on the court. *Doctor*, 76 S.W.3d at 504. The purposeful availment requirement insures that the nonresident defendant's contacts result from its own purposeful activity and not the unilateral activity of the plaintiff or a third party. *Id.* Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established "minimum contacts" with the forum state. *Marchand*, 83 S.W.3d at 795.

 An exercise of jurisdiction must also comport with traditional notions of fair play and substantial justice. *Id.* In this inquiry, it is incumbent upon the defendant to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.*, 471 U.S. at 477, 105

---

3. General jurisdiction is based on the defendant's continuous and systematic contacts with the forum. *Experimental Aircraft Ass'n v. Doctor*, 76 S.W.3d 496, 504 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Such contacts permit the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from, or relate to, the defendant's activities conducted within the forum state. *Id.* Appellant does not argue that Bottle Rock is subject to general jurisdiction in Texas, although Bottle Rock, perhaps attempting to negate all bases of jurisdiction, dedicates some discussion in its brief to the issue.

S.Ct. 2174. The following factors, when appropriate, should be considered: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute (including the state's special regulatory interest in areas such as insurance); (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal*, 815 S.W.2d at 231.

### B. Standard of Review

 The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *See Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 633 (Tex.App.-Dallas, 1993, writ denied). At the special appearance hearing, the burden shifts to the nonresident defendant to negate all bases of personal jurisdiction. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex.1995). This standard does not mean that the nonresident defendant must negate every possible ground in the universe, but rather the acts in Texas alleged by the appellant to support personal jurisdiction. *Scott v. Huey L. Cheramie, Inc.*, 833 S.W.2d 240, 241 (Tex.App.-Houston [14th Dist.] 1992, no pet.). On appeal, an appellate court reviews all evidence in the record to determine if the nonresident defendant negated all grounds for personal jurisdiction. *Abacan Tech. Servs. Ltd. v. Global Marine Int'l Servs. Corp.*, 994 S.W.2d 839, 843 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

 Whether a court has personal jurisdiction over a defendant is a question of law. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex.

2002); *Marchand*, 83 S.W.3d.at 794. The trial court's decision to grant or deny a special appearance is subject to *de novo* review on appeal, but when a factual dispute exists, as it does here, an appellate court is called upon to review the trial court's resolution of the factual dispute. *Coleman*, 83 S.W.3d at 806; *Marchand*, 83 S.W.3d at 794; *M.G.M. Grand Hotel, Inc. v. Castro*, 8 S.W.3d 403, 408 (Tex.App.-Corpus Christi 1999, no pet.) When the trial court does not issue findings of fact, a reviewing court should presume that the trial court resolved all factual disputes in favor of its judgment. *Coleman*, 83 S.W.3d at 806. However, when the appellate record includes both the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Marchand*, 83 S.W.3d at 793.

In reviewing a legal sufficiency challenge, the no evidence challenge fails if there is more than a scintilla of evidence to support the finding. *Marchand*, 83 S.W.3d at 795. More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). In reviewing a factual sufficiency challenge, we set aside the trial court's decision only if its ruling is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Cartlidge*, 9 S.W.3d at 346. Also, in reviewing a factual sufficiency challenge, we must consider and weigh evidence that tends to prove the existence of a vital fact, as well as evidence that disproves its existence. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 892 (Tex.App.-Fort Worth 1997, writ denied).

## III. IS ARLIE BEANE BOTTLE ROCK'S AGENT?

■ Appellant argues the trial court erred in granting Bottle Rock's special appearance because the evidence is factually and legally insufficient to support such a finding. In so doing, appellant contends the evidence sufficiently established that Bottle Rock formed a contract, or committed a tort, because Beane was Bottle Rock's agent in Texas. Therefore, the crux of this jurisdictional inquiry is whether Arlie Beane was an agent of Bottle Rock, and if so, whether his contacts with Texas are sufficient to confer the jurisdiction of our courts over Bottle Rock. Implied in the trial court's judgment is the finding that there was no agency relationship between Beane and Bottle Rock. However, when determining whether an agency relationship existed between Bottle Rock and Beane, we must be mindful that the issue of ultimate liability is separate from the issue of jurisdiction. *Arterbury v. Am. Bank & Trust Co.*, 553 S.W.2d 943, 948 (Tex.Civ.App.-Texarkana 1977, no writ). Surveying all the evidence, we conclude that the evidence is legally and factually insufficient to support the trial court's implied finding, and thus, we find that Bottle Rock is subject to specific jurisdiction in Texas.

### A. Principles of Agency

■ An agent is one who consents to the control of another, the principal, who has manifested consent that the agent shall so act. *Royal Mortgage Corp. v. Montague*, 41 S.W.3d 721, 732 (Tex.App.-Fort Worth 2001, no pet.). An agency relationship does not depend upon the express appointment or assent by the principal; rather, it may be implied from the conduct of the parties. *Id.* In a recent special appearance case in which an agency relationship was at issue, the Texarkana Court of Appeals set forth the governing rules in such an inquiry:

We cannot presume an agency relationship exists. An agency relationship may be found from underlying facts or direct and circumstantial evidence showing the relationship of the parties. An "agent" is one who is authorized by a person or entity to transact business or manage some affair for the person or entity. An essential element of the principal-agent relationship is the alleged principal's right to control the actions of the alleged agent. This right includes not only the right to assign tasks, but also the right to dictate the means and details of the process by which an agent will accomplish the task.

*Townsend v. Univ. Hosp.-Univ. of Colorado*, 83 S.W.3d 913, 921 (Tex.App.-Texarkana 2002, pet. denied) (citations omitted); *see also Happy Indus. Corp. v. Am. Specialties, Inc.*, 983 S.W.2d 844, 852 (Tex. App.-Corpus Christi 1998, pet. dism'd w.o.j.). The principal's extent of control over the details of accomplishing the assigned task primarily distinguishes the status of independent contractor from that of agent. *Happy Indus.*, 983 S.W.2d at 852.

■ Appellant maintains that Beane, on behalf of Bottle Rock, requested appellant's services in soliciting and placing a bond. According to appellant, Beane was Bottle Rock's agent and his actions in Texas constitute minimum contacts sufficient for the exercise of personal jurisdiction.[4] We agree.

### B. Actual Authority

■ Actual authority is created through written or spoken words or con-

---

4. For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal. *See Daynard v. Ness, Motley, Load-* *holt, Richardson & Poole, P.A.*, 290 F.3d 42, 55 (1st Cir.2002).

duct of the principal communicated to the agent. *See Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex.App.-Houston [1st Dist.] 1994, no writ). The existence of an agency relationship based on actual authority may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question. *See Johnson v. Holly Farms of Tex., Inc.*, 731 S.W.2d 641, 645 (Tex.App.-Amarillo 1987, no writ). Whether Bottle Rock, the purported principal, gave Beane actual authority to act as its agent cannot be readily discerned from the record.

Bottle Rock insists Beane is not, nor has he ever been, an agent acting on its behalf. Bottle Rock casts Beane as a third party who, presumably, gratuitously put Walker in contact with Hagan. In his affidavit, Suess stated:

No person by the name of "Arli Beane," [sic] or any similar name, is or has ever been an officer, director, shareholder, or authorized agent of BRPC. "Arlie Beane" has never had any authority to conduct business for or make contracts for BRPC.

■ Echoing this sentiment, Hagan testified that Bottle Rock did not have any agents or employees in Texas. At submission, however, Bottle Rock characterized Beane as both a "facilitator," and an "information provider," as well as an intermediary between Walker and Bottle Rock's officers with respect to the bond's acquisition. Nevertheless, a forum cannot exercise personal jurisdiction over a nonresident defendant based upon a third party's unilateral activity. *See Guardian Royal*, 815 S.W.2d at 227; *see also Hanson*, 357 U.S. at 253, 78 S.Ct. 1228 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.")

■ To support his claim of agency, appellant points to the representations by Beane regarding the acquisition of the bond and incentive fee. However, it is settled law in Texas that mere declarations of an alleged agent, standing alone, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority. *Durand v. Moore*, 879 S.W.2d 196, 202–03 (Tex.App.-Houston [14th Dist.] 1994, no writ). The evidence does not directly show that Bottle Rock had the right to assign tasks to Beane and to control the means and details of the process by which Beane performed any tasks. In the record, we find no contract of employment, no specific description of control over Beane's work, and no explanation of the manner in which Beane would have been paid, if at all. Thus, we find no evidence of actual authority upon which an agency relationship between Beane and Bottle Rock was based.

### C. Apparent Authority

■ We note, however, that there is evidence that Beane wielded *apparent* authority on behalf of Bottle Rock. While actual authority is created by written or spoken words or conduct by the principal to the agent, apparent authority is created by written or spoken words or conduct by the principal to a third party. *See Cameron County Sav. Ass'n v. Stewart Title Guaranty Co.*, 819 S.W.2d 600, 603 (Tex. App.-Corpus Christi 1991, writ denied). To establish apparent authority, one must show that a principal either knowingly permitted an agent to hold himself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority. *See NationsBank v. Dilling*, 922 S.W.2d 950, 952–53 (Tex.1996). A party seeking to charge a principal through the apparent authority of an agent must establish conduct by the principal

that would lead a reasonably prudent person to believe the agent had the authority it purported to exercise. *Id.; see also Disney Enters., Inc. v. Esprit Fin., Inc.,* 981 S.W.2d 25, 30 (Tex.App.-San Antonio 1998, pet. dism'd w.o.j.). In determining whether an agent had apparent authority, a court considers only the conduct of the principal that would lead a third party to believe the agent had apparent authority. *Dilling,* 922 S.W.2d at 953.

Here, a number of acts by Bottle Rock, the purported principal, suggest that a reasonably prudent person would believe Beane possessed the authority to act on Bottle Rock's behalf. First, Walker testified that one of Bottle Rock's directors confirmed his understanding of Beane's authority to act and negotiate on its behalf.[5] Appellant also points to the specific interactions between Beane and Bottle Rock as evidence of agency. Walker, summarizing his interactions with Beane during cross-examination, testified:

> My contact person at all times was Arlie Beane, even down to the request of the Indemnity Agreement. I had to go through Arlie Beane.

> At that point Arlie Beane would either inform Mr. Wynmiller, Mr. Suess, any parties involved, that they needed to get this signed. We had conversation[s] with Arlie Beane that we need[ed] this done. Arlie Beane was the point man. He would either contact them and tell them we had to have this or he'd contact

me or he'd [contact] Associated Insurance.[6]

Walker's testimony evidences Beane's role as an intermediary to facilitate communications between appellant and Bottle Rock. It also evidences Bottle Rock's endorsement of Beane's efforts. Indeed, surveying the evidence in the record, we find that Bottle Rock knew Walker was dealing with Beane and using Beane as an intermediary and "point man" in the process of obtaining the bond on their behalf. Bottle Rock also knew that Walker's contacts with it were primarily through Beane. During the majority of the negotiations, Walker communicated with the officers and directors of Bottle Rock mostly through Beane. Walker testified that he had several telephone conversations with Hagan, Suess, and Wynmiller, but the great majority of his dealings were with Beane. At no point did Hagan, Suess, or Wynmiller tell Walker that Beane did not have the authority to negotiate or contract on behalf of Bottle Rock.[7] From all outward appearances, Beane was acting on behalf of Bottle Rock, and *nothing in the record suggests Bottle Rock discouraged that appearance.*

Considering the foregoing, Bottle Rock's assertions that Beane was not an agent are not sufficient to defeat the evidence adduced by appellant. Undeniably, the evidence established that Beane was actively involved with acquisition of Bottle Rock's

---

**5.** During the special appearance hearing, Walker was asked:
> Q. "Other than Mr. Beane, did you have any knowledge from anybody else of what his position of authority was with Bottle Rock?"
> A: [Director] Jimmy Wynmiller.

**6.** Bottle Rock objected to this statement on the grounds that it was nonresponsive. However, it failed to secure a ruling from the court on the objection. Walker also testified

that he had informed Wynmiller and Hagan that Beane had promised him additional compensation.

**7.** Far from contradicting Walker's testimony about Beane's specific interactions and representations, Hagan—Bottle Rock's only live witness—could not account for the nature and extent of Beane's activities with respect to the acquisition of the bond.

bond. It also established that Bottle Rock was aware of Beane's involvement, having acted on and complied with Beane's efforts to acquire the bond. Plainly, Bottle Rock endorsed Beane's actions. Contrary to this evidence are Bottle Rock's statements, through Suess and Hagan, that Beane is not Bottle Rock's agent. However, we cannot say that this evidence amounts to more than a scintilla. The overwhelming weight of the evidence indicates an agency relationship between Beane and Bottle Rock. Reviewing all the evidence, we find there is factually and legally sufficient evidence supporting a relationship between Bottle Rock as principal and Beane as agent for purposes of determining jurisdiction.

## IV. DID BOTTLE ROCK RATIFY BEANE'S AGENCY?

 Even if we assume Beane was not an authorized or apparent agent of Bottle Rock, for the purposes of this analysis, the evidence shows that Bottle Rock accepted and ratified Beane's efforts.[8] A principal can ratify the acts of an agent and thereby subject himself to the jurisdiction of a foreign forum.[9] *See Disney Enters.*, 981 S.W.2d at 31–32. Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for

purposes of personal jurisdiction, if the principal later ratifies the agent's conduct. *Daynard,* 290 F.3d at 55; *Maurice Pierce & Assocs., Inc. v. Computerage, Inc.,* 608 F.Supp. 173, 177 (N.D.Tex.1985) (noting that "ratification of the contract may support an assertion of personal jurisdiction"). Accordingly, in the limited context of this jurisdictional inquiry, Bottle Rock cannot now deny Beane's authority to act on behalf of the corporation when it has already accepted the benefits of both Walker and Smith's services, which it acquired as a direct result of Beane's efforts. *See Montague,* 41 S.W.3d at 735 n. 6 (noting in jurisdictional analysis that "[o]ne cannot accept the benefits of a repudiated agency without assuming the burdens imposed by the agency"); *see also Inn Foods v. Equitable Co–Operative Bank,* 45 F.3d 594, 598 n. 7 (1st Cir.1995) (noting that "benefits received are certainly strong evidence that the principal acquiesced in the agent's transaction"). Throughout Beane and Walker's discussions, Bottle Rock supported, accepted, and followed through on the efforts initiated by Beane. Here the record clearly reveals that once the contact between Beane and Walker was initiated, Bottle Rock negotiated with Smith and Walker through Beane, and eventually consummated an agreement with Associated, appellant's broker.

---

**8.** In its brief and at submission, Bottle Rock contended that ratification is a plea in avoidance which appellant has waived as it was not affirmatively plead as required by Texas Rule of Civil Procedure 94. *See* TEX.R. CIV. P. 94 (requiring a party shall set forth affirmative defenses and matters of avoidance in pleading to a preceding pleading); *see City of Austin v. Castillo,* 25 S.W.3d 309, 314 (Tex.App.-Austin 2000, pet. denied) (noting that the theory of ratification is a matter of avoidance or affirmative defense). However, this is not a case where a purported principal has brought an action against a third party over a transaction by an alleged agent where the third party's failure to plead ratification waives an affirmative defense. Here, the third party has sued

the purported principal, and the issue of ratification is not raised as an affirmative defense to a preceding pleading but rather as a jurisdictional predicate. *Cf.* TEX.R. CIV. P. 94.

**9.** Most caselaw interpreting the doctrine of ratification couches its discussion in the context of an existing agency relationship. *Disney Enters.,* 981 S.W.2d at 31. However, such a relation is not necessary to cause the ratification to be effective. *Id.* Moreover, although ratification of the act of a stranger will not create an agency relationship, it does bind the ratifier to the specific transaction that is ratified. *Id.*

Accordingly, we find Bottle Rock effectively ratified Beane's efforts on its behalf.

## V. DUE PROCESS

### A. Minimum Contacts

 Having determined that Beane was indeed an apparent agent of Bottle Rock for the purposes of this jurisdictional inquiry, we next consider whether Bottle Rock, through its own actions and those of its agent, purposefully established minimum contacts with Texas. *See Burger King Corp.*, 471 U.S. at 474, 105 S.Ct. 2174 (noting that "the constitutional touchstone remains whether the [nonresident] defendant purposefully established 'minimum contacts' in the forum State."); *see also Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir.1993) (stating that "[a]ctivities of a party's agent may count toward the minimum contacts necessary to support jurisdiction"). Bottle Rock's activities must have been "purposefully directed" to the forum and the litigation must result from alleged injuries that "arise out of or relate to" those activities. *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174. Considerations such as the quality, nature, and extent of the activity in the forum, the foreseeability of consequences within the forum from activities outside it, and the relationship between the cause of action and the contacts, relate to whether it can be said that the defendant's actions constitute purposeful availment. *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1268. (5th Cir.1981).

 Beane, a resident of Texas and acting on behalf of Bottle Rock, approached Walker about the acquisition of the bond. *See Billingsley Parts & Equip., Inc. v. Vose*, 881 S.W.2d 165, 169 (Tex. App.-Houston [1st Dist.] 1994, writ denied) (finding specific jurisdiction when, among other factors, nonresident defendant made initial contact with Texas company). They discussed the transaction on the telephone for several weeks, and ultimately, Beane spent two full days in Walker's offices in connection with the acquisition of the bond. Bottle Rock communicated with Walker through Beane, and Walker conducted business with Bottle Rock through Beane. Bottle Rock's acquisition of the bond arose directly from the efforts of Walker and Beane, including personal visits by Beane to Walker's office, and telephone and facsimile communications to and from Texas. Thus, Bottle Rock had dealings with appellant, who it knew to be a Texas resident, and by accepting the benefits of Beane's contacts in Texas, Bottle Rock could reasonably anticipate and foresee being haled into a Texas court in a dispute arising out of that transaction.[10] Indeed, Beane's pre-litigation activities within Texas directly relate to the causes of action averred by appellant.

Though Beane was the "point man," Walker also had telephone conversations with Bottle Rock's out-of-state officers, directors and attorneys. He testified that he had several telephone conversations with Suess and Wynmiller. On several occasions, including the time that he volunteered the use of his bank account, Walker spoke with Hagan on the telephone. Bottle Rock's telephone communications with a Texas resident may be considered in the

---

**10.** Both appellant's tort and contract claims arise from the alleged incentive fee agreement. Bottle Rock did not dispute the existence of the incentive fee agreement. *See Runnells v. Firestone*, 746 S.W.2d 845, 851 (Tex.App.-Houston [14th Dist.]) *writ denied*, 760 S.W.2d 240 (Tex.1988) (per curiam) ("Texas courts have permitted nonresidents to offer proof that no contract existed, notwithstanding the plaintiff's ultimate burden to prove the existence of the contract at the trial on the merits.") Rather, Bottle Rock argued that as Beane was not its agent it has no contacts within the State of Texas.

minimum contacts jurisdictional analysis. *See Quill Corp. v. North Dakota*, 504 U.S. 298, 308, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines") (*quoting Burger King*, 471 U.S. at 476, 105 S.Ct. 2174); *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 701 (3rd Cir.1990).

■■■ At submission, Bottle Rock reminded this court that appellant's claim arose from a dispute over the alleged $100,000 finder's fee, not from the acquisition of the bond itself. In making this distinction, Bottle Rock intimated that Bottle Rock might be subject to personal jurisdiction on a claim over the acquisition of the bond but not from a claim arising from any alleged service fee premised upon Beane's alleged oral representations. Indeed, Bottle Rock argues that it had "no contact with the State of Texas concerning additional monies to be paid to Appellant." At the special appearance hearing, Hagan testified:

Q. Now, prior to receiving notice of this lawsuit, had Bottle Rock been made aware of any representations by Mr. Beane *relating to money to be paid in addition to the bond premium?*

A. Before the bond was issued, the answer to that question is no. Approximately 30 days or 60 days after the bond was issued, I received a telephone call from Mr. Walker. And Mr. Walker then asked me about a matter of a hundred thousand dollars that he thought he was entitled to receive and that was the first I'd heard about it.

Q. But at no time prior to the issuance of the bond and you tendering the bond premium were you aware of any representations that may or may not have been made by Mr. Beane?

A. About the hundred thousand dollars?

Q. *About any money other than the bond premium?*

A. That's correct. Say it, before the bond was issued, I had no idea there was any money due other than the $125,000.

■■■ We find for purposes of this jurisdictional inquiry, that the acquisition of the bond and the alleged incentive fee are inextricably intertwined. An agent is not a party to, nor individually liable on, a contract he enters into on behalf of his principal—it is the principal who enters into the contract. *See Ross F. Meriwether & Assocs., Inc. v. Aulbach*, 686 S.W.2d 730, 731 (Tex.App.-San Antonio 1985, no writ). If the issue is merely whether Beane exceeded the scope of his apparent authority by offering an incentive fee, we impermissibly stray into the liability question. If an agent is acting within the scope of general authority, "his wrongful act, though unauthorized, will nevertheless subject his principal to *liability*." *Arterbury*, 553 S.W.2d at 949 (emphasis added). When reaching a decision to exercise or decline jurisdiction, the trial court should rely only upon the necessary jurisdictional facts and should not reach the merits of the case. *Id.* at 948.

## B. Traditional Notions of Fair Play & Substantial Justice

■■■ Finally, we must also determine whether Bottle Rock's contacts comport with traditional notions of fair play and substantial justice. *See Guardian Royal*, 815 S.W.2d at 231. Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Id.* In approaching this inquiry, we must

be mindful of: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute (including the state's special regulatory interest in areas such as insurance); (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.*

■ Despite Bottle Rock's repeated protestations that it has no agents or offices in Texas, nothing in the record indicates litigating this cause in Texas would be excessively burdensome. Moreover, Texas has a strong interest in resolving disputes over both breaches of contract and torts committed within its boundaries. Texas's interest in adjudicating the dispute, and appellant's interest in obtaining convenient and effective relief weigh in favor of Texas's exercising its jurisdiction. In sum, considering these factors, as well as the minimum contacts Bottle Rock has with Texas, we cannot say that subjecting Bottle Rock to the jurisdiction of a Texas court would offend traditional notions of fair play and due process.

Thus, the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process.

### CONCLUSION

For the foregoing reasons, we find the trial court erred in granting Bottle Rock's special appearance because the evidence was legally and factually insufficient to support its ruling. Therefore, we reverse the judgment and remand the case to the trial court for further proceedings.