# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00059-CV

**Panté Technology Corporation, Appellant**

**v.**

**Austin Concrete Solutions, Inc., Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. D-1-GN-09-000809, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellee Austin Concrete Solutions, Inc. ("Austin") sued Christopher M. Steele and appellant Panté Technology Corporation ("Panté") for fraud and breach of contract. Austin later dropped its suit against Steele, but Panté filed a cross-claim against Steele for breach of fiduciary duty. The jury found that Panté entered into and breached a contract with Austin, but did not commit fraud. The jury also found that Steele did not breach his fiduciary duty to Panté. The trial court rendered judgment consistent with the jury's findings. Panté appeals in five issues, asserting that (1) the evidence was legally and factually insufficient to support the jury's finding that Panté entered into a contract with Austin, and (2) the evidence conclusively showed that Steele breached his fiduciary duty to Panté, or in the alternative, the jury's finding that Steele did not breach his fiduciary duty is against the great weight and preponderance of the evidence. We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Seeking to diversify its investment portfolio, Panté, a provider of technology services and products, decided to invest in real estate by building high-end houses. Lacking experience in the building trade, Panté sought to partner with professionals who had construction expertise. Martin Ward, Panté's president, testified that he identified four knowledgeable building professionals with whom he wanted to partner, one of whom was Steele, a construction expert Ward knew from Steele's work for another builder. When he learned that Steele was nearing the end of a construction project with his then-current employer, Ward approached Steele about working with Panté on several building projects.

The exact nature of Steele's relationship with Panté was unclear. Ward testified that he and Steele envisioned working together, "building a better mousetrap" by creating a "team concept . . . by bringing together more partnerships and builders . . . to work on one single project or multiple projects having multiple project managers." According to Ward, Steele shared his enthusiasm for this apparently novel approach to home-building, and the two men began discussing plans for collaborating on their first building project in a new subdivision near Lake Travis called Spanish Oaks ("the project"). Ward testified that Steele originally suggested that he (Steele) act as general contractor on the project and that Panté take the role of "owner" or financier. Ward, however, envisioned having more control over the day-to-day aspects of the project and, according to his testimony, specifically wanted to retain control over the hiring of contractors and subcontractors. Steele testified that in practice, his company, Construction & Company, made the day-to-day decisions, paid the various suppliers and subcontractors directly, and submitted the

invoices to Panté for reimbursement. Steele testified that he had no direct financial investment in the project apart from his time, for which he received a "salary" or "fee"—the parties disagree on the label—of roughly $9,200 per month. Although Steele and Panté never entered into a written contract to define the parties' precise roles with respect to the project, it is undisputed that Steele was affiliated with Panté and had authority to act on its behalf for some purposes.

The extent of that authority is central to the dispute here. The parties agree that Steele had Panté's authority to purchase the lot in Spanish Oaks, clear it, and prepare it for the foundation to be poured. Panté asserted that, after those tasks were complete, "Ward repeatedly instructed Steele not to enter in contracts on behalf of Panté, never authorized Steele to enter into [the contract at issue here], and repeatedly instructed him to stop all work that had been started on the [Spanish Oaks project]." Steele testified differently. He stated that, despite receiving several e-mails from Ward instructing him to stop building, Ward orally repudiated his e-mailed instructions and instructed Steele to continue building the foundation.

Austin, a concrete subcontractor that Steele hired to build the house's foundation, completed a large part of the foundation per the contract, but Panté refused to pay for most of the work done. Austin sued Steele and Panté for breach of contract and fraud. Panté answered and asserted that it was not liable to Austin because Steele was not acting as Panté's agent when he contracted with Austin. Panté also filed a cross-claim against Steele asserting that if Steele was found to be Panté's agent, he breached his fiduciary duty to Panté by contracting with Austin. Panté asserted that Steele put his own interests—having a finished "show house" ready in time for the

3

Parade of Homes[1]—ahead of Panté's financial interest by not soliciting additional bids for the foundation and by continuing to build the foundation after being ordered to stop. Before trial, Austin dropped its claims against Steele. The jury returned a verdict in favor of Austin on the breach-of-contract claim and in favor of Steele on Panté's fiduciary-duty claim against him. The trial court rendered judgment consistent with the verdict and denied Panté's motion for new trial. Panté filed this appeal.

## STANDARD OF REVIEW

In reviewing a jury verdict for legal sufficiency, we consider the evidence in the light most favorable to the verdict, crediting evidence favorable to the verdict if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We reverse the court's judgment only if the evidence presented at trial would not allow reasonable and fair-minded jurors to reach the finding under review. *Id.* We will sustain a legal-sufficiency challenge if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. More than a scintilla of evidence exists when reasonable and fair-minded people could

---

[1] The Spanish Oaks Parade of Homes was a marketing event organized by the developer of the subdivision to "showcase" several new-home builders. Essentially, the parade was a coordinated series of open houses providing an opportunity for builders to display their best designs to potential clients and "kick-start" demand for the neighborhood.

differ in their conclusions based on the evidence in the record. *Forbes, Inc. v. Granada Biosciences*, 124 S.W.3d 167, 172 (Tex. 2003).

"When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). "The court of appeals is not a fact finder. Accordingly, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

## DISCUSSION

### *Agency*

In its first three issues, Panté challenges the legal and factual sufficiency of the evidence supporting the jury's affirmative answer to Question 1 of the court's charge. Question 1 asked: "Did [Panté] and [Austin] agree that [Austin] would construct a residential concrete foundation in exchange for payment?"[2] Challenging the jury's affirmative answer to that question, Panté asserts that (1) there is no evidence that Panté directly entered into a contract with Austin, (2) there is no evidence that Steele was Panté's agent when he contracted with Austin, and (3) there is factually insufficient evidence to support the jury's finding. The parties appear to agree that Panté never directly contracted with Austin. The parties also agree that Steele negotiated and

---

[2] The court instructed the jury in the relevant law of agency, which is discussed below.

entered into a contract with Austin. They dispute, however, whether Steele was acting as Panté's agent when doing so. Thus, by finding that Panté had a contract with Austin, the jury apparently concluded that Steele acted as Panté's agent in contracting with Austin. Consequently, we must examine the evidence regarding Steele's agency relationship with Panté.

"The law does not presume agency. Absent actual or apparent authority, an agent cannot bind a principal." *Suarez v. Johnson*, 35 S.W.3d 268, 272-73 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citation omitted). "Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess." *Id.* at 273. "Actual authority is created through written or spoken words or conduct of the principal communicated to the agent. The existence of an agency relationship based on actual authority may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question." *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549-50 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (citation omitted).

While actual authority is created by words or conduct of the principal to the agent, apparent authority is created by words or conduct by the principal to a third party. *Id*.

> To establish apparent authority, one must show that a principal either knowingly permitted an agent to hold himself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority. A party seeking to charge a principal through the apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe the agent had the authority it purported to exercise.

*Id.* at 550-51.

6

*Evidence of Steele's Authority*

Panté admits that "the evidence is disputed as to whether [Steele] had a builder/developer and/or employee/employer relationship with Panté."[3] Panté also acknowledges that Steele testified that he had authority to "go ahead" with the Austin contract, but asserts that Steele's testimony about his authority amounts to no more than a scintilla in light of the other evidence presented at trial.

Steele admitted receiving several e-mails from Ward ordering him, first, not to begin construction and, later, to stop construction. Steele testified, however, that each time Ward

---

[3] Ward himself was equivocal about Panté's relationship with Steele. Ward testified:

Q.     Do you agree that [Steele] was your builder?

A.     [Steele] was hired—let me be very clear, as it relates to "builder" so everyone can understand as it relates to the roles and definition.

Q.     Can you answer my question first?

A.     Was he my builder?

Q.     Yes, sir.

A.     For the Spanish Oaks property?

Q.     Yes, sir, the only one we're talking about.

A.     No and yes.

Ward then explained that Steele was hired to perform various tasks in preparation for building the house in Spanish Oaks, among other remodeling and construction jobs, but that the parties did not have a formal "contractual" relationship. Later, however, when questioned by Austin's counsel, Ward admitted that Panté published a prospectus that was distributed to potential investors listing Steele and his then-existing construction firm as one of Panté's "builders."

7

instructed him to stop building, the two men would communicate either in person or by telephone and, encouraged by Steele, Ward would relent and allow construction to continue. Steele testified:

> Q. You heard Mr. Ward's lawyers say that possibly one of their positions is that [Ward] told you to stop building this house . . . .
>
> A. Correct.
>
> Q. Okay. Tell the jury what your response is to that. If they claim that, what's your response?
>
> A. Indeed, he did tell me to stop multiple times, e-mailings. I agree with that statement.
>
> Q. Did you stop?
>
> A. No.
>
> Q. Why?
>
> A. Because we talked in person on the phone all the time, had meetings that lasted six or eight hours talking about things. And I guess we contradicted ourselves.
>
> . . . .
>
> Q. Your position is, I never told him to stop [sic] because I always talked to him after he would say stop. I'd go talk, we'd get it fixed. I always had his approval to keep going?
>
> A. Correct.
>
> . . . .
>
> Q. So you didn't feel like you had to ask him for permission, even though you did that several times?
>
> A. Correct. It seems like—I mean, we had meetings, phone calls, e-mailings, everything it was always, go, go, go; stop, go, stop, go, stop. Go, go, go, go, stop. Go. You know, so—

8

Austin's counsel next questioned Steele about the series of e-mails exchanged between him and Ward in which Ward appeared to order Steele to stop construction:

Q. Let's look at Exhibit 82, please. 82 is an e-mail from—actually two e-mails. . . . Let's start there first, lower part of the page dated August 8th, and this is an e-mail to you from Mr. Ward, right?

A. Correct.

Q. And this says—if you look down there about halfway down there, it says, "Do not commit Panté to any financial obligations."

A. Correct.

Q. And then . . . if you look, same date, you see the first one was at August 8th. So now we just looked at July 28th. So this is about a week—about a week later. And this one says 1:23 p.m. Then we go to 7:50 p.m., a couple of hours later the same day. You respond to Mr. Ward, "All is well from our"—look at the very beginning. "All is well from our meeting today." Is that—did you meet with him on August 8th.

A. I am assuming so, yes.

Q. What did you talk about?

A. I believe this is the day that I met with [Ward] and his wife. And I had sent [Ward] an e-mail that was kind of trying to get him on the ball. He thought it was—you know, he thought it wasn't very nice, more or less. I was trying to light a fire under him to start acting correctly, in my opinion. And he sent me one that said, Don't send me e-mails like this. I don't appreciate it. And then he called me and we met up at Barnes & Nobles and kind of made up. And him and his wife were there. And he gave me a book. You know, today everything is good, pats me on the back, yea. And we were on our way.

Q. So go—

A. So I went home, sent him this e-mail that night.

. . . .

9

Q. So still on Exhibit 82 where he says, "Do not commit Panté to any financial obligations," August 8, 2008 in the afternoon. You then meet with him and his wife at Barnes & Noble later that afternoon and talked that out. And your testimony is that he basically agreed that you were going to keep going?

A. Correct.

Q. I think I said keep going. Keep working on the project at this house, okay, Spanish Oaks?

A. Yes.

Steele also testified that, nine days after the August 8 e-mail exchange and the meeting at Barnes & Noble, he sent Ward a progress report indicating that construction of the foundation was proceeding as planned.

Q. Okay. Let's go to Exhibit 83, please. . . . August 17, this is an e-mail to Mr. Ward. Again, that's who MW is, right?

A. Yes.

Q. And the—from you. And it says, "The slab should be ready to start depending on weather this week." So this is a couple of weeks that—we were at August 8, now we're two weeks later, week and a half later. You're telling him the slab's getting ready to start. As of this date, are you going forward on the slab.

A. Correct, correct.

Steele testified that, after sending the August 17 progress report indicating that the foundation work was proceeding, he received no response from Ward. Steele further testified that he e-mailed

Ward other status reports discussing the planned foundation work, yet never received a response.

Steele testified:

Q.   Next e-mail, Exhibit 84. . . .  August 22.  This is an e-mail again to Mr. Ward from you, right?

A.   Correct.

Q.   If you look down at the second paragraph—so here we are, that was the 18th. 19, 20, 21, 22, four days later and you tell him, "If everything goes well, we should be started on the slab by next Tuesday."  So you started—you had like three weeks before you said, I am doing the slab soon; two weeks before that you said, slab, depending on the weather, we're getting ready to do the slab. Now, you are saying getting ready to start the slab as of August 22.  On this date, are you going forward or not?

A.   Yes.

Q.   Next exhibit, please, 85.  E-mail dated August 23, next day from what we just looked at.  Look at what you tell him here.  This is from you to him again, right?

A.   Yes.

. . . .

Q.   Okay. And let's see, you tell him, I am ready to start the foundation on Tuesday of this week coming up, 8/26. And the foundation guys are ready. You say, I am done with the basement cut and lot cut. . . .

A.   Right.

Q.   Did he ever come out and say, stop on this date?  Did he come out there and say stop?

A.   No.

. . . .

11

Q. "The foundation should start Tuesday and go"—"be going on for the next two months plus a little bit." As of August 22, '08, are you going forward or not?

A. Yes. We're doing construction out there, correct.

. . . .

Q. Okay. August. Now, we're on Exhibit 86, September 2. So here we are a couple of—let's say that was August 23, a week and a half, two weeks later. Look at the first line on the second paragraph. "I am ready to start the slab tomorrow." That Lot 142 in Spanish Oaks, that is this house, right?

A. Right.

Q. As of September 2 are you going forward with the slab or not?

A. Yes.

Q. Okay. Next e-mail, please, Exhibit 87. September 5, 2008. So here we are, three days after the last one we just looked at. Look down on the second paragraph about halfway down. "The slab started today and I am moving full steam ahead!" That was an e-mail you sent to Mr. Ward, right?

A. Yes.

Steele also testified that, meanwhile, Panté was paying Austin's bills for the foundation work as they were submitted.

Ward testified that, despite receiving Steele's progress-report e-mails, he did not know the foundation was being built prior to September 11, 2008. That same day, Ward sent Steele an e-mail instructing him to "[p]lease stop all work including the foundation until we have a finish[ed] set of plans in place" and expressing concerns that "[r]ight now the budgetary number given $5 million, are [sic] extremely too high for this project." Steele testified that he did not stop work immediately when he received Ward's e-mail because "[Ward] and I would discuss stuff and

12

keep rolling." Steele also testified that between September 11 and the parties' next e-mail exchange on October 6, Steele and Ward had discussed the project and they "had talked about keep going, keep going, keep going."

The October 6, 2008 e-mail exchange, however, appears to contradict Steele's assertion that Ward instructed him to continue building the foundation. Ward's e-mail states that Panté "need[ed] to have a complete set of plans to determine cost for all area including foundation" and mentions the need for the two men to meet "prior to any work being performed." Steele replied later that evening, noting that they had not spoken that day and telling Ward to "call [him] tomorrow morning or anytime so we can catch up." In a follow-up e-mail to Ward, Steele appears to be surprised and confused at Ward's instruction to halt work. Steele's e-mail states: "After you sent me the attached e-mail we spoke in person and you said for me to keep going and that you do not want to be the one dragging behind." Steele indicates that Ward told him to "keep going" on "that day at Barnes and Nobles."

Meanwhile, construction continued. In one of Ward's next e-mails to Steele, dated October 29, 2008, he indicates to Steele that he is "greatly disturbed" about an invoice "received for a period of performance that exceed[s] the date in which I requested and informed that all work was to cease on this project." At this point, construction on the foundation stopped on Panté's order. Following this, the e-mails between Ward and Steele became increasingly antagonistic, with Steele demanding money and support and Ward demanding that Steele cease all building work. The exchanges culminated in a February 16, 2009 e-mail from Ward to Steele informing Steele that Panté's attorney instructed him to "cut communication" for the time being.

13

Panté argues that the e-mail evidence proves that Steele lacked Panté's authority to order the foundation's construction. It points to several of Steele's progress reports in which he requests Ward's permission to proceed on the foundation work—e-mails that were sent well after the point at which Steele claimed he had authority to begin construction. Through his testimony, however, Steele provided an explanation. Steele testified that he "asked for permission [to go ahead with the Austin contract] about ten times . . . because certain times I did have permission, certain times I didn't." Steele testified that Ward had a tendency to get "cold feet" as the project progressed and Panté's investment increased. He also stated that Ward would "blow hot and cold" on the same issues from one day to the next, which led Steele to view Ward's seemingly clear instructions with a degree of skepticism.

Viewing the evidence in the light most favorable to the verdict, we conclude that Steele's testimony, coupled with the documentary evidence, amounts to more than a scintilla of evidence to support the jury's implied finding that Steele was acting as Panté's agent when he entered into a contract with Austin. Although there is evidence in the record supporting Panté's assertion that Steele lacked authority, Steele's testimony that he had Ward's oral permission to proceed with the foundation work alone is enough evidence to allow reasonable and fair-minded jurors to conclude that Steele had actual authority from Panté to contract with Austin on Panté's behalf. As the sole judge of the credibility of the witnesses and the documentary evidence, the jury could reasonably have chosen to believe Steele's testimony and discount contrary evidence.

Furthermore, the various e-mail exchanges, read as a whole, are ambiguous at best about Steele's authority or lack thereof. A reasonable jury could have concluded, as Austin argued,

14

that Ward's lack of response to Steele's various progress reports about the continuing foundation work gave rise to a reasonable inference that Ward knew about Steele's actions and agreed with them or at least acquiesced in them. Although Ward testified that his health did not allow him to respond immediately to many of those e-mails, his testimony does not render such an inference unreasonable as a matter of law. Thus, we conclude that the jury's verdict was supported by legally sufficient evidence. Likewise, after considering and weighing all the evidence, we cannot say that the judgment is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Although Panté presented evidence in support of its assertion that Steele lacked actual authority, Steele's testimony to the contrary was detailed. We conclude, therefore, that the trial court's judgment is supported by factually sufficient evidence. We overrule Panté's first three issues.

### Fiduciary Duty

In its fourth issue, Panté asserts that it presented conclusive evidence that Steele breached his fiduciary duty to Panté. In the alternative, Panté argues in its fifth issue that the jury's finding that Steele complied with his fiduciary duty is not supported by factually sufficient evidence.

*Waiver*

As a preliminary matter, we consider *sua sponte* whether Panté waived these two issues by failing to comply with several rules of appellate procedure. *See, e.g.*, *Vortt Exploration Co. v. EOG Res., Inc.*, No. 11-07-00159-CV, 2009 WL 1522661, at *2 (Tex. App.—Eastland May 29, 2009, no pet.) (mem. op.) ("An appellate court has the inherent power to

15

control its own docket."). Issues four and five challenge the jury's findings as to Steele's alleged breach of fiduciary duty, yet Panté failed to (1) name Steele as an appellee on the cover of its appellant's brief; (2) name Steele as an appellee in its list of parties and counsel in its appellant's brief,[4] *see* Tex. R. App. P. 38.1(a); (3) list Steele as an appellee in its docketing statement, *see id.* R. 32.1(e); or (4) serve Steele with copies of any of its filings in this Court, *see id.* R. 9.5.[5] It is too late to correct these deficiencies, especially the last one. In light of these violations, we hold that Panté has waived its appellate issues against Steele. *See id.* R. 25.1 ("Any party's failure to take any other step required by these rules, . . . does not deprive the appellate court of jurisdiction but is ground only for the appellate court to act appropriately, including dismissing the appeal."); *Whiteside v. Ford Motor Credit Co.*, 220 S.W.3d 191, 193 (Tex. App.—Dallas 2007, no pet.) (positing without deciding that appellant waived issues by failing to comply with rules, but addressing the merits); *Mixson v. Kirby Lumber Co.*, 298 S.W. 476, 477 (Tex. Civ. App.—Beaumont 1927, no writ) (striking appellant's issues for failure to properly serve appellee). Notwithstanding this waiver by Panté, we will, in the interest of justice, briefly address the merits as to issues four and five.

*The Merits*

The elements of breach of fiduciary duty are: the existence of a fiduciary relationship, and a breach of duty by the fiduciary that causes damages to the client or improper benefit to the

---

[4] In the "Identity of Parties and Counsel" section of Panté's brief, Steele is listed as "Defendant Non-suited below."

[5] We note that Panté's notice of appeal, a copy of which was mailed to Steele, was sufficiently broad to invoke this Court's jurisdiction over Steele and Panté's issues against him. *See* Tex. R. Civ. P. 25.1(b) ("The filing of a notice of appeal by any party invokes the appellate court's jurisdiction over all parties to the trial court's judgment or order appealed from.").

16

fiduciary. *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999); *see also Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 429 (Tex. App.—Austin 2009, no pet.). In Texas, an agent is a fiduciary of his principal. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002). Because of that "special relationship," the agent must (1) act primarily for the benefit of the principal; (2) account to the principal for profits arising out of the agency; (3) not act for, or on the account of, a party whose interests are adverse to the principal's; (4) not compete with the principal in matters relating to the agency; and (5) deal fairly with the principal in all transactions between them. *Id.* (citing Restatement (2d) of Agency § 387 (1958)).

Panté asserts that Steele violated his fiduciary duty by advancing his own interests and those of his fledgling company, Construction & Company, ahead of Panté's. Panté asserts that "[b]ecause of Steele's focus on showcasing himself as a builder through the Parade of Homes, he ignored Ward's requests to wait for completed plans before beginning the foundation, and he ignored Ward's request to stop work." Panté points to three specific ways that Steele breached his fiduciary duty: (1) by excluding Panté from the advertising materials for the Parade of Homes and "only giving his name and his company's name," (2) "by 'apparently' committing Panté to financial obligations with Austin," and (3) "by not stopping the foundation work when he was told to stop." Panté argues that there is "conclusive evidence" to establish Steele's breach of fiduciary duty. "A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence." *W.H.V., Inc. v. Associates Hous. Fin., LLC*, 43 S.W.3d 83, 87 (Tex. App.—Dallas 2001, pet. denied).

17

Based on the evidence presented at trial and discussed above, we cannot say that "ordinary minds could not differ as to the conclusion to be drawn from the evidence" relevant to Steele's alleged breach of his fiduciary duty. *See id.* As we have already discussed, there was enough evidence for a reasonable jury to find that Steele had actual authority to proceed with the foundation construction as he did. In finding that Steele complied with his fiduciary duties to Panté, the jury could have focused on Steele's testimony that he had Panté's permission to contract with Austin and build the foundation. Crediting that testimony, the jury could have found that Steele complied with his fiduciary duty by following the orders of his principal. Further, Steele's failure to include Panté's name in the advertising for the Parade of Homes is not a per se breach of his fiduciary duty. This is especially true in light of the contradictory testimony about the parties' roles in the project—i.e., whether Steele was the "builder" and Panté the "owner" or whether they were "co-builders." Given this contradictory testimony, the jury could have concluded that Steele was the sole "builder" on the project. Accordingly, failing to list Panté as a "co-builder" in the Parade of Homes advertising documents is not conclusive evidence that Steele acted improperly. We conclude that the record contains more than a scintilla of evidence to support the jury's finding that Steele complied with his fiduciary duty to Panté.

Finally, after considering all the evidence, we cannot say that the evidence supporting the jury's verdict is so weak as to make the finding clearly wrong and unjust. Thus, the verdict is supported by factually sufficient evidence.

We overrule Panté's fourth and fifth issues.

18

**CONCLUSION**

Having overruled Panté's issues on appeal, we affirm the trial court's judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   October 7, 2010