TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-05-00246-CV






Navasota Resources, Ltd., Appellant


v.


Heep Petroleum, Inc. and Larry W. Kimes, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT

NO. 97-01738, HONORABLE PETER M. LOWRY, JUDGE PRESIDING





C O N C U R R I N G O P I N I O N




 I concur in the majority opinion and write to set forth additional reasoning. In this
accelerated, interlocutory appeal, appellant Navasota Resources, Ltd., challenges the trial court's
denial of its special appearance. The lawsuit underlying this appeal involves the investment and
exploration activities of numerous parties in oil and gas leases for property primarily located in
Montana and North Dakota and was brought by appellees Heep Petroleum, Inc., Caiman Exploration
Co., Boone H. Heep, III, and Larry W. Kimes (1) in Travis County district court against Navasota and
others (2) for breach of contract, breach of fiduciary duties, fraud, conversion, and tortious interference
with a contract. Because I find sufficient evidence in the record to support the trial court's exercise
of jurisdiction, I would affirm the trial court's order denying the special appearance.


BACKGROUND


 Appellant Navasota is a diversified Canadian company participating in the drilling
of oil and gas wells. The company is listed on the Vancouver Stock Exchange. Boone Heep, III,
("Heep") is the president and chief executive officer of Heep Petroleum, Inc., a Texas corporation
located in Austin, Texas. Heep Petroleum is in the business of generating oil and gas projects and
is also an independent producer that sometimes purchases production.

 Heep first became acquainted with Navasota in the summer of 1993 when he met Jim
Simpson, head of corporate development for Navasota, at a barbeque event at an oil well located in
Fayette County. Navasota had invested in several properties located in Texas, including leases in
Fayette County, through operator Edco Energy, an Austin company. In the fall of 1995, Heep was
formally introduced to Simpson at a mutual friend's home in Austin. At that meeting, Simpson told
Heep that Simpson was looking for oil and gas projects on behalf of Navasota. Heep discussed with
Simpson an oil and gas project known as the Williston Basin joint venture located in Montana that
forms the basis of this lawsuit. Simpson expressed an interest.

 On October 19, 1995, Simpson met with Heep and Steve Weller at an associate's
Austin real estate office. Weller was the owner and president of Advanced Technology Oil and Gas,
Inc., a Texas corporation ("Advanced Technology"), and a partner in the joint venture. At the
meeting, Weller, a geologist who put the joint venture together, made a presentation to Simpson
about the project. At the conclusion of the meeting, Simpson called Navasota's president, Bill
Sanesh, and explained the deal to him. After the telephone conversation, Simpson told Heep, "We'll
take the deal." The parties then drafted a letter of intent based on the negotiations at the meeting.

 By letter dated November 2, 1995, on behalf of "Steve Weller and myself," Heep
thanked Simpson for the meeting and advised him that they were "looking forward to working with
you and Navasota Resources on the Williston Basin Project as we feel it will be a successful and
profitable venture for all involved." Heep advised Simpson that he and Weller had executed the
letter of intent and forwarded it to Richard Dolecek of Discovery Exploration, Inc. ("Discovery") and
then to Simpson for execution by Navasota. Heep concluded the letter, "Please tell Mr. Sanesh I
enjoyed visiting with him and we look forward to our next meeting." Dated November 1, the letter
of intent was circulated and executed by all the parties. The signatories to the letter were Bill Sanesh
of Navasota, Weller of Advanced Discovery, Heep of Heep Petroleum, and Dolecek of Discovery. 
Sanesh was identified as the "Participant or Participant's nominee" in the "proposed Texas joint
venture" to be comprised of Discovery, Advanced Technology, and Heep Petroleum. (3)

 On December 1, 1995, the same parties entered into a Participation and Exploration
Agreement, setting forth the terms of the joint venture. Sanesh executed the agreement on behalf
of Navasota as its president. The agreement included a choice-of-law provision, stating that the laws
of the State of Texas would "govern the determination of the validity of this Agreement, the
construction of its terms, and the interpretation of the rights and remedies of the parties." The
agreement also provided for binding arbitration and designated the Texas General Arbitration Act
to control any controversy that might arise. 

 At about the same time, the parties entered into a compensation agreement with the
same choice-of-law and arbitration provisions as the participation and exploration agreement. The
agreement was executed on January 17, 1996, but was effective as of November 15, 1995. The 
agreement between Discovery, Advanced Technology, and Heep Petroleum specified the
compensation that Discovery and Advanced Technology would pay Heep for their introductions to
Navasota and another Canadian company, Roulette Resources, Ltd., "relative to the Participation and
Exploration Agreements."

 Meanwhile, in December 1995, Navasota acquired a 25% non-operating working
interest in the joint venture and Roulette acquired the remaining 75% interest. An amendment to the
agreement was executed by the parties on February 1, 1996. The executed amendment was
forwarded by Navasota's attorney to Heep in Austin to arrange for execution of the amended
agreement by both Heep Petroleum and Advanced Technology. 

 On February 6, 1996, Navasota and Heep Petroleum entered into a participation and
exploration agreement for the Big Waully Prospect, an oil and gas development project in North
Dakota. Navasota agreed to purchase a ten percent leasehold interest. A payment schedule provided
for payments in February and March 1996 to Amarado Oil Company, a Texas company located in
Austin.

 The lawsuit at issue primarily involves the investment and exploration activities of
numerous parties in the Williston Basin joint venture. The dispute began in 1997 when Heep, Heep
Petroleum, Caiman Exploration Co., (4) and Larry Kimes, the vice president of Heep Petroleum to
whom Heep had assigned an interest, sued Rufus Mathews and Charles Weller, (5) both residents of
Harris County, who had engaged in joint efforts with Heep to invest in and market various oil and
gas projects, including the Williston joint venture. The original petition related to the compensation
agreement and concerned the compensation to be paid to Heep for introducing Navasota and
Roulette to Advanced Technology and Discovery. 

 As a result of the growing dispute and a realignment of business partners, in 1998
Navasota and Discovery executed an exploration agreement recognizing, according to Navasota's
brief on appeal, "the continuing validity" of Heep Petroleum's interest under the 1995 participation
and exploration agreement. Specifically, the agreement recited the settlement of a dispute between
Navasota and Discovery and the continuing existence of a dispute between Navasota, Discovery,
Heep, and other parties. With regard to the choice-of-law provision, the parties to the exploration
agreement selected the State of Colorado and also consented to venue and jurisdiction in Colorado.

 In 1999, the Heep Petroleum plaintiffs amended their petition to join Navasota,
Advanced Technology, Discovery, Steven Weller, Dolecek, and two other parties, seeking a
declaratory judgment "for construction of several contracts between the various parties" and various
causes of action seeking damages, including claims for breach of contract, breach of fiduciary duty,
fraud, conversion, and tortious interference with contract. The Heep Petroleum plaintiffs also sought
the imposition of a constructive trust and an accounting.

 In response, Navasota filed a special appearance, asserting that it was not subject to
personal jurisdiction in Texas. After a hearing, the trial court overruled the special appearance,
determining that the company is subject to jurisdiction in Texas. Navasota appeals the trial court's
order.


ANALYSIS


 Navasota contends that the trial court erred in denying its special appearance because
Navasota did not have sufficient minimum contacts with Texas for a Texas court to exercise personal
jurisdiction over it. Specifically, Navasota urges that, because the agreements concerned the
development of oil and gas leases in Montana and North Dakota, the trial court improperly exercised
jurisdiction. In its special appearance objecting to jurisdiction, Navasota asserted that (i) Navasota
is not and has never been a Texas resident; (ii) Navasota does not now engage and has not engaged
in business in Texas nor committed any tort in the State; and (iii) Navasota does not maintain a place
of business in Texas and has no employees, servants, or agents within the State. 


Burden of Proof and Standard of Review

 The Texas long-arm statute authorizes exercise of jurisdiction over a nonresident who
"does business" in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997). The plaintiff
has the initial burden to plead sufficient allegations to bring a non-resident defendant within the
personal jurisdiction of a Texas court. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789,
793 (Tex. 2002). The nonresident defendant bears the burden of negating all bases for personal
jurisdiction alleged by the plaintiff. Id. (citing Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199,
203 (Tex. 1985)). Whether a court has personal jurisdiction over a defendant is a question of law,
which we review de novo. Marchand, 83 S.W.3d at 794.

 The trial court frequently must resolve questions of fact before deciding the
jurisdictional question. Id. When, as here, the trial court does not issue findings of fact and
conclusions of law with its ruling, all facts necessary to support the judgment and supported by the
evidence are implied. Id. at 795. However, in cases in which the appellate record includes both the
reporter's and clerk's records, as it does here, these implied findings are not conclusive and may be
challenged for legal and factual sufficiency. Id.

 A legal sufficiency challenge will fail if there is more than a scintilla of evidence to
support the finding. Id. More than a scintilla of evidence exists when the evidence rises to a level
that would enable reasonable and fair-minded people to differ in their conclusions. Walker Ins.
Servs. v. Bottle Rock Power Corp., 108 S.W.3d 538, 548 (Tex. App.--Houston [14th Dist.] 2003,
no pet.). A factual sufficiency challenge requires proof that the trial court's ruling was so contrary
to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. 
Goodenbour v. Goodenbour, 64 S.W.3d 69, 75 (Tex. App.--Austin 2001, pet. denied). In
conducting this review, we consider the entire record, not just the evidence in support of the
challenged fact. Walker Ins. Servs., 108 S.W.3d at 548. In reviewing the record, we are mindful that
we must not address the merits of the case. Issues of liability are separate inquiries, and are properly
reserved for a full trial on the merits. Id. at 549.


Personal Jurisdiction

 Two conditions must be met for a Texas court to exercise personal jurisdiction over
a non-resident defendant: the Texas long-arm statute must authorize the exercise of jurisdiction, and
the exercise of jurisdiction must be consistent with the guarantees of due process. Marchand, 83
S.W.3d at 795; Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990).

 The Texas long-arm statute allows a Texas court to exercise personal jurisdiction over
a non-resident defendant that does business in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. 
A non-resident does business in Texas if it (1) contracts by mail or otherwise with a Texas resident
and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole
or in part in this state; or (3) recruits Texas residents, directly or through an intermediary located in
this state, for employment inside or outside this state. Id. In addition, the statute provides that "other
acts" by the non-resident can satisfy the requirement of "doing business" in Texas. Id.; see also
Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex.
1991).

 Because the language of the long-arm statute is broad, its requirements are considered
satisfied if the exercise of personal jurisdiction comports with federal due process limitations. CSR
Ltd. v. Link, 925 S.W.2d 591, 594 (Tex. 1996). The cornerstone of due process in the context of
personal jurisdiction is the minimum-contacts analysis. Schlobohm, 784 S.W.2d at 357. The goal
of this analysis is to protect a defendant from being unjustifiably called before the courts of a foreign
state. Id. To establish minimum contacts with a state, the defendant "must do something purposeful
to avail himself of the privilege of conducting activities in the forum, thus invoking the benefit and
protection of its laws." Id.; see also Burger King v. Rudzewicz, 471 U.S. 462, 474-76 (1985). (6) A
defendant should not be subject to the jurisdiction of a Texas court based upon random, fortuitous,
or attenuated contacts. CSR Ltd., 925 S.W.2d at 595. The purposeful availment requirement ensures
that the non-resident defendant's contact must result from its purposeful contact, not the unilateral
activity of the plaintiff or a third party. See Guardian Royal, 815 S.W.2d at 227. It is the quality and
nature of the contacts, rather than their number, that is important. Id. at 230 n.11. The exercise of
personal jurisdiction is proper when the contacts proximately result from actions of the non-resident
defendant that create a substantial connection with the forum state. Id. at 226. We also inquire
whether the defendant's conduct and connection with the forum state is "such that he should
reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444
U.S. 286, 297 (1980).

 The terms of the agreements at issue must also be evaluated to determine whether the
defendant purposefully established minimum contacts with the forum. See Burger King, 471 U.S.
at 479. Merely contracting with a Texas corporation does not satisfy the minimum-contacts
requirement. Id. at 478. Nor is the making of payments in Texas alone sufficient to establish
minimum contacts. U-Anchor Advertising, Inc. v. Burt, 553 S.W.2d 760, 763 (Tex. 1977), cert.
denied, 434 U.S. 1063 (1978). When, as here, the foreign defendant has contact with the forum by
virtue of the formation of a contract, prior negotiations and contemplated future consequences, the
terms of the contract and the parties' actual course of dealing must be evaluated to determine
whether the defendant purposefully established minimum contacts within the forum. Burger King,
471 U.S. at 479.

 Personal jurisdiction exists if the non-resident defendant's minimum contacts give
rise to either specific jurisdiction or general jurisdiction. Helicopteros Nacionales de Colombia,
S.A. v. Hall, 466 U.S. 408, 413-14 & nn.8-9 (1984). Specific jurisdiction is established if the non-resident defendant's alleged liability arises from or is related to the defendant's purposeful contact
with the forum. Helicopteros, 466 U.S. at 414 & n.8. When specific jurisdiction is asserted, the
minimum-contacts analysis focuses on the relationship among the defendant, the forum, and the
litigation. Guardian Royal, 815 S.W.2d at 227-28. It is not necessary that a non-resident
defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully
directed toward the state. CSR Ltd., 925 S.W.2d at 595. A defendant should reasonably anticipate
being haled into court when the effects of its conduct have been intentionally caused through the
purposeful direction of activity toward the forum state, even if the defendant never physically enters
the state. Wright v. Sage Eng'g, Inc., 137 S.W.3d 238, 248 (Tex. App.--Houston [1st Dist.] 2004,
pet. denied). General jurisdiction is present when a defendant's contacts are continuous and
systematic, allowing the forum to exercise personal jurisdiction over the defendant even if the cause
of action did not arise from or relate to activities conducted within the forum state. Guardian Royal,
815 S.W.2d at 228. General jurisdiction requires a showing that the defendant conducted substantial
activities within the forum, a more demanding minimum-contacts analysis than for specific
jurisdiction. Id.

 A court must determine a "special appearance on the basis of the pleadings, any
stipulations made by and between the parties, such affidavits and attachments as may be filed by the
parties, the results of discovery processes, and any oral testimony." Tex. R. Civ. P. 120a(3). 
Although Navasota argued that it had no contacts with the State of Texas, the record convinces us
otherwise.


 1. Specific Jurisdiction

 We first review the record regarding Navasota's contacts with Texas to determine
whether they are sufficient to establish specific jurisdiction. In this case, the evidence shows that
Navasota has purposefully established minimum contacts with Texas. Two essential contracts
relating to the investment and exploration activities of the parties support the exercise of jurisdiction:
(i) the compensation agreement and (ii) the participation and exploration agreement with
amendments. The contracts originated in Texas with Texas participants and arose from Simpson's
travels to Texas and through mail and facsimile transmissions directed to Texas participants. It is
the terms of the joint venture formed at the Texas meeting that are the basis of the lawsuit. As a
consequence of disagreements between Navasota and Heep Petroleum regarding their rights and
duties under the agreements, Heep Petroleum sued Navasota asking for, among other things, a
declaratory judgment defining the rights of the parties involved. In addition, as set forth below,
correspondence between Navasota in Canada and Heep Petroleum and Advanced Technology in
Texas, substantial payments directed to Texas, and choice-of-law agreements between the parties
provide the required nexus to the state.

 In its live pleading on file when the trial court decided the special appearance, Heep
Petroleum, a Texas resident, alleged that Navasota "engages in business in Texas" and that its causes
of action arose from its "written contracts" and transactions with Navasota, Discovery, and
Advanced Technology that occurred or were consummated in Travis County. Two of these parties
to the 1995 agreement, Advanced Technology (7) and Heep Petroleum, were Texas entities and
Navasota's participation in the joint venture allegedly originated at the meeting in Austin that
resulted in the letter of intent. Simpson participated in the presentation, sought the approval by
Navasota's president at the conclusion of the meeting, and confirmed the company's agreement to
the joint venture. The letter of intent was executed by Advanced Technology and Heep Petroleum
in Austin and forwarded to Discovery and Navasota for execution. 

 Navasota presented no testimony by witness or affidavit. To meet its burden to negate
all potential bases of jurisdiction, Navasota offered into evidence at the hearing the following
exhibits: Navasota's responses to Heep Petroleum's interrogatories, Heep Petroleum's first amended
answers to Navasota's interrogatories, the 1995 Participation and Exploration Agreement, the
Compensation Agreement, a demand for arbitration by Discovery and Navasota against Roulette and
two other Canadian companies regarding participation in the Williston Basin joint venture, and a
draft participation agreement forwarded to Sanesh as President of Navasota by facsimile on
November 22, 1995, with a notation of a copy sent to Simpson.

 Heep Petroleum tendered evidence at the hearing to establish both specific and
general jurisdiction. Heep testified at the hearing and Heep Petroleum tendered thirty-eight exhibits
that were admitted into evidence. Heep testified that after meeting Simpson at the Fayette County
barbeque, he was again introduced to Simpson "who would come down to visit Edco Energy."
Simpson told Heep that he was looking for oil and gas projects on behalf of Navasota. Heep
described the meeting and technical presentation in October 1995 and testified that he overheard
Simpson's telephone call with Sanesh. Heep testified that the contracts were drafted based on the
discussions at the meeting and Navasota's acceptance of the "deal" at the close of the presentation.

 The evidence included various correspondence, sent by mail and facsimile, between
Navasota in Canada and Heep Petroleum in Austin. A letter dated February 2, 1996, from
Navasota's attorney to Heep in Austin enclosed a draft of the First Amendment to the Participation
and Exploration Agreement. The attorney requested that Heep execute the agreement on behalf of
Heep Petroleum and arrange for Advanced Technology in Austin to execute the agreement. The
exhibits also included (i) evidence of payments of money to Texas partners as directed by Heep and
(ii) a participation and exploration agreement between Navasota and Heep Petroleum dated February
6, 1996, for the Big Waully Prospect located in North Dakota providing for Navasota's purchase of
a ten percent leasehold interest with scheduled payments to be received by Amarado Oil Company,
a Texas corporation located in Austin. (8) 

 Although Navasota disputed that Simpson was employed by Navasota in October
1995, the evidence showed that Simpson was the head of corporate development for the relevant
time period. Heep testified that Simpson stated that he was representing Navasota and looking for
opportunities on its behalf. According to a press release, Simpson had been in charge of corporate
development for Navasota since June 1995. Navasota acknowledges that Simpson met with Heep
in Texas in October 1995 to discuss the joint venture and that Simpson "then successfully solicited
Navasota" to invest. 

 Navasota does not dispute that the agreements between the parties originated at the
meeting in Austin, but only disputes Simpson's status or authority. Navasota denies that Simpson
was acting as its representative on Simpson's trip to Texas. In its answer to interrogatories admitted
into evidence at the hearing, Navasota denied that Simpson was either "an officer or director" when
he met with Heep in Texas and further stated, "Navasota is not aware of, and can find no record of
Mr. Simpson traveling to Texas on behalf of Navasota for any purpose, but cannot rule out the
possibility that Mr. Simpson, while an officer or director of Navasota, could have met once or
infrequently with Edco Energy, Inc., ('Edco') regarding Navasota's working interest investment in
certain Austin Chalk wells." Navasota argues that Heep Petroleum "attempts to infer from
Simpson's prior and subsequent status as Navasota's 'Head of Corporate Development' that he was
acting in that capacity when he traveled to Texas in October 1995."

 Evidence at the hearing included a 1996 Navasota press release that listed Simpson
as head of "corporate development" and stated, "His role with the Company is to promote the
Company in the United States and to find and develop corporate opportunities." Another undated (9)
press release again identified Simpson as head of corporate development, referenced Navasota's
participation in the Williston joint venture and Big Waully project, and stated: "The company is also
negotiating participation in a 3-D gas program in Goliad County, Texas. The program is designed
to target the Wilcox formation and the operator of this program is Edco Energy." A September 1996
release identified Simpson as head of corporate development with extensive experience in the oil and
gas and mining industries. At the hearing, Navasota's attorney acknowledged "a dispute over Mr.
Simpson's authority and ability to represent Navasota at this time" and asserted that, "He has been
affiliated with Navasota, but he wasn't in the Fall of 1995." We need not address the question of
whether Simpson had the authority to represent Navasota at the meeting to the extent it may bear on
the merits of the dispute. (10) From the evidence adduced at the hearing, the trial court could conclude
that Simpson was representing Navasota in his negotiations with Heep Petroleum for the purposes
of jurisdiction. Navasota has not met its burden of showing that the implied findings are contrary
to the great weight of the evidence, or that the legal conclusions are not supported by a scintilla of
evidence in the record.

 A choice-of-law provision is also relevant in determining whether a non-resident has
subjected itself to the jurisdiction of the forum state. Although a choice-of-law provision is not
dispositive of jurisdiction, that the non-resident agreed to be governed by Texas law in matters
arising under the contract is a factor in determining whether jurisdiction should be had in the forum
state. 3-D Electric Company, Inc. v. Barnett Constr. Co., 706 S.W.2d 135, 145 n.9 (Tex.
App.--Dallas 1986, writ ref'd n.r.e.). Two of the agreements here specifically provided that the laws
of the State of Texas would govern the determination of the validity of the agreement, the
construction of its terms, and the interpretation of the rights and remedies of the parties. They also
provided that binding arbitration had to comply with and be governed by the provisions of the Texas
General Arbitration Act. See Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-.098 (West 2005). 

 This case is similar to Fish v. Tandy Corp., 948 S.W.2d 886, 895 (Tex. App.--Fort
Worth 1997, pet. denied). In Fish, the court of appeals held that Fish had established minimum
contacts with Texas by negotiating and contracting with Tandy Corporation in Fort Worth, even
though the distributorship agreement was for the distribution of Tandy products in Russia. Id. at
894-95. The underlying suit arose when the parties disagreed over their rights and duties under the
distributorship agreement. Id. at 895. The court held that the contractual dispute arose from Fish's
contacts with Texas because the questions about the parties' rights and duties under the agreement
were directly linked to Fish's negotiations with Tandy in Texas. Id. This case, like Fish, involves
the negotiation of a contract that was to be largely performed outside of Texas. As the court stated,


The letter agreement and the distribution agreement were agreements arising directly
from the negotiations between Tandy and Fish involving personal visits by Fish to
Texas and telephone, mail, and facsimile communications to and from Texas. This
is probative and significant evidence that Fish's claims relate to or arise from his
contact with Texas, and such a determination is not so contrary to the overwhelming
weight of the evidence as to be manifestly wrong.



Id. Both cases involve disputes over the parties' rights and duties under their agreements. In the
instant case, although the underlying purpose of the contract was to develop oil and gas leases in
Montana and North Dakota, the relationship and agreements were formed during Simpson's trips
to Texas. The causes of action relate directly to and arise from Navasota's contacts with Texas.

 In sum, the evidence considered for purposes of the special appearance shows that
the contracts at issue were negotiated by representatives of the companies in Austin and were
executed by two of the companies in Austin, that these two companies were Texas corporations, that
the lawsuit at issue arose out of the Austin meetings, and that correspondence and payments were
directed to Texas entities in the state. We conclude that the quality and nature of the contacts is
sufficiently substantial for the trial court to exercise jurisdiction. Although we conclude that
Navasota purposefully established minimum contacts with Texas, jurisdiction does not rest on these
contacts alone. We turn now to general jurisdiction.


 2. General Jurisdiction

 The parties dispute whether it is proper to exercise general jurisdiction over Navasota
based on its doing business in the State of Texas. Although in its special appearance Navasota
denied that it had ever engaged in business in the State of Texas, once Heep Petroleum produced
evidence that it had done so, Navasota was required to negate this basis for jurisdiction with
evidence. Navasota argues--without producing evidence at the hearing--that it formally terminated
all activities in the State of Texas prior to being served with the amended petition. Because
Navasota's contacts were sufficient to support the exercise of general jurisdiction, withdrawal prior
to suit does not necessarily eliminate jurisdiction. In any event, because Navasota failed to negate
this basis for jurisdiction, I would conclude that the denial of special appearance may be affirmed
on this ground as well.

 A corporate communications release dated September 1996 and compiled for its
shareholders identified Navasota as "a diversified resource company participating in the drilling of
oil and gas wells in the Williston Basin of Montana and North Dakota and in Texas and other
exploration ventures." Although Navasota denied doing business in Texas, in an answer to
interrogatories, Navasota identified eight wells or drilling programs in the State of Texas in which
it had non-operating working interests. (11) These included wells in the counties of Grimes, Fayette,
Goliad, Archer, and Webb.

 One Navasota press release referenced negotiations for participation in a gas program
in Texas commencing in the summer of 1996 and discussed the Williston joint venture, which, the
release stated, "should have a positive affect on the cash flow in the fall of 1996." As to the
Williston joint venture, in which Navasota had a 25% working interest, the release further stated,
"the program is operated on behalf of the company by Advanced Tech Oil and Discovery
Explorations, Inc." The release then identified Navasota's Texas projects:


On November 6, 1995, the company announced that Wellman #2 well commenced
production. The well is located in Grimes County, Texas and is operated by
Chesapeake Energy (listed on the New York Stock Exchange). On Novemer 15,
1995, the company negotiated a further acquisition of a working interest in the
Wellman #1 . . . . The Company purchased a 10.9% working interest in Wellman #1
and 15.1% working interest in Wellman #2. The cash flow is approximately
$100,000 US per month and the asset value is $3,054,700 US. The Company also
acquired a 15% working interest in the Ansell #1 well which is operated by Edco
Energy Inc. of Austin, Texas. The Ansell #1 well is located in Fayette County,
Texas. It is a low pressure oil well currently producing between 50 to 120 barrels per
day. Furthermore, the Company is negotiating with Edco Energy Inc. to acquire up
to 15% working interest in the Berclair Prospect, also in Texas . . . . The prospect is
located in Southwestern Goliad County along the Bee/Goliad County line. The large
prospective areas coupled with probability of wells over 100' of net prospective
reservoirs leads to a possible prospect size up to one trillion cubic feet of gas.



 Other Navasota press releases referenced Navasota's working interest in the Diebel
#1 well in Goliad County with operator Edco Energy, a second well to be drilled in Goliad County
within sixty days after Diebel #1, (12) and Navasota's acquisition of a working interest in a twenty-well
drilling program in Webb County, Texas, and in a 5200 foot well in Archer County, Texas. 

 Navasota argues that its contacts with Texas were not continuous and systematic, and
were, therefore, insufficient to establish general jurisdiction. Navasota urges that because its
activities in "certain 'Austin Chalk' horizontal drilling programs," involving properties in Grimes,
Goliad, Archer, and Webb Counties, do not relate to the lawsuit and were "terminated" prior to
Navasota being served with the amended petition, they are insufficient to establish general
jurisdiction. Citing Equitable Production Co. v. Canales-Trevino, 136 S.W.3d 235, 240-43 (Tex.
App.--San Antonio 2004, pet. denied), Navasota urges that its "withdrawal" from Texas should
weigh heavily against a finding of general jurisdiction. However, in finding that Equitable's contacts
with Texas were sufficiently continuous and systematic to support the exercise of general
jurisdiction, the San Antonio court of appeals determined that the company's relocation of its
corporate offices from Texas to Virginia three months before suit was filed was but one factor to
consider in assessing the existence of jurisdiction. Id. at 242-43.

 More importantly, Navasota failed to satisfy its burden to negate this basis for
jurisdiction. After asserting that it had never engaged in business in Texas, Navasota failed to
respond to the evidence tendered by Heep Petroleum at the hearing. Navasota introduced its own
answers to interrogatories showing it had a working interest in at least eight wells or drilling
programs from 1993 until some time in early 1999. Navasota did not offer evidence that these
activities did not constitute doing business within the state. Nor did it offer evidence that these
business activities were random, fortuitous, or attenuated contacts. See American Type Culture
Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002). The evidence showed that they were
sufficiently systematic and continuous, such that Navasota "purposefully availed" itself of the
privilege of conducting activities in Texas and could reasonably have anticipated being haled into
a Texas court. See Burger King, 471 U.S. at 475.

 Because Navasota failed to negate general jurisdiction, I would hold that the trial
court did not err in its exercise of jurisdiction.


Traditional Notions of Fair Play and Substantial Justice

 Under the second prong of the test for due process, a party opposing a non-resident
defendant's special appearance must show that the exercise of in personam jurisdiction comports
with fair play and substantial justice. International Shoe Co. v. Washington, 326 U.S. 310, 316
(1945). Because the minimum contacts analysis encompasses considerations of fairness, it has
become less likely that the exercise of jurisdiction will fail a fair play analysis. Schlobohm, 784
S.W.2d at 357-58; Burger King, 471 U.S. at 476-77. This analysis is separate and distinct from the
minimum-contact issue, though, and must be conducted. Schlobohm, 784 S.W.2d at 358. We
therefore consider whether, despite the existence of minimum contacts, there are any reasons why
our assertion of jurisdiction in this case would offend traditional notions of fair play and substantial
justice. 

 Navasota argues that the burden on the nonresident defendant here is great because
Navasota is a Canadian company located in a remote region of British Columbia and the travel
expenses are prohibitive. Because the properties at issue in the litigation between the parties are in
Montana and North Dakota, Navasota contends that Texas's interest in adjudicating this dispute is
minimal: "The only connection to Texas is the fact that Heep is a Texas resident." Nothing in the
record shows that litigation in a Texas court would be excessively burdensome or inconvenient to
Navasota. Navasota did not offer any evidence at the hearing; it does not identify its representatives,
witnesses or the burden entailed. In light of the fact that Simpson traveled at least to Fayette and
Travis Counties on various occasions and that the company held leasehold interests in at least five
Texas counties, we cannot say that litigating a dispute in the state would be unreasonably
burdensome.

 Texas has a legitimate interest in adjudicating disputes interpreting its own oil and
gas leases. In addition to the choice-of-law provisions implicating Texas law, the State's interest in
enforcing its own law is heightened when the case involves a business involving mineral resources
in Texas. Texas Commerce Bank v. Interpol '80 Ltd., 703 S.W.2d 765, 773-74 (Tex. App.--Corpus
Christi 1985, no writ). Of course, this interest may be less acute when the dispute at issue does not
concern Texas properties. See also Guardian Royal, 815 S.W.2d at 229 (State's regulatory interest
is an important consideration in deciding whether exercise of jurisdiction is reasonable).

 Reviewing the record, we find ample evidence to support the trial court's conclusion. 
We have concluded that the quality, nature, and extent of Navasota's activity in Texas justifies a
conclusion that it could expect to be called into Texas courts. Nothing in the record suggests that
litigation in a Texas court would be excessively burdensome or inconvenient. The nature of the
underlying dispute calls for the application of Texas law designed to protect Texas residents.

 We conclude that the due process concerns are satisfied in this case and that the
exercise of jurisdiction over Navasota by a Texas court does not offend traditional notions of fair
play and substantial justice.


CONCLUSION


 Considering all of Navasota's contacts with Texas, including the relationship between
the defendant, the forum, and the litigation, I would hold that the trial court did not err in concluding
that Navasota's purposeful contacts with Texas were sufficient to support the assertion of general
as well as specific jurisdiction. Moreover, Navasota failed to negate all bases of jurisdiction and did
not show that the assertion of jurisdiction by a Texas court would otherwise be unreasonable. I
concur in the majority opinion, affirming the trial court's order denying Navasota's special
appearance.




 __________________________________________

 Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Puryear

Filed: June 30, 2006

1. Because the interests of these parties coincide for the purposes of this appeal, any reference
to Heep Petroleum is to the plaintiffs-appellees unless otherwise specified. References to Heep are
to the individual plaintiff-appellee.
2. The remaining defendants in the underlying lawsuit include Rufus C. Mathews, Jr., Charles
F. Weller, Discovery Exploration, Inc., Advanced Technology Oil & Gas, Inc., High Plains
Associates, Inc., Steven W. Weller, Douglas J. Kirn, and Richard D. Dolecek.
3. Both Advanced Technology and Heep Petroleum are Texas corporations. Discovery is a
Colorado corporation.
4. Caiman Exploration Co. was incorporated by Heep in October 1993 under the name Logic
Energy & Exploration, Inc.; it changed its name to Caiman Exploration Co. in May 1996. 
5. Charles Weller is Steve Weller's brother.
6. "So long as it creates a 'substantial connection' with the forum, even a single act can
support jurisdiction." Burger King, 471 U.S. at 475 n.18. See also Holk v.USA Managed Care, 149
S.W.3d 769, 774 (Tex. App.--Austin 2004, no pet.) (three telephone calls over four years to forum
state to solicit customer for fishing boat charter along the Gulf coast).
7. Heep Petroleum introduced Advanced Technology's articles of incorporation showing that
it is a Texas corporation. 
8. In a letter dated February 1, 1996, from Heep to Sanesh, Heep confirmed that Navasota had
agreed to purchase a ten percent leasehold interest and non-operating working interest in the Big
Waully Prospect in North Dakota with an option to purchase an additional ten percent interest with
a schedule of two payments to be made to Amarado Oil Company, a Texas corporation, in Austin,
Texas. Evidence included a Navasota check dated February 12, 1996, payable to Amarado Oil
Company in the amount of $165,822.84; a Navasota check dated February 26, 1996 payable to
Amarado Oil Company; a Navasota check dated March 12, 1996, payable to Heep Petroleum and
showing receipt by Heep Petroleum and Amarado Oil in Austin; a drilling program for the North
Dakota lease dated March 5, 1996, sent by facsimile from Navasota to Edco Energy and Heep
Petroleum and showing approval and acceptance by Heep Petroleum and Navasota; and various other
facsimile transmissions and correspondence sent from Navasota to Heep Petroleum in Austin.
9. Its context indicates it was released in early 1996.
10. Our jurisdictional inquiry merely requires a determination of whether Navasota engaged
in purposeful, minimum contacts toward Texas in connection with the underlying dispute. All other
issues are properly reserved for trial on the merits. See Walker Ins. Servs. v. Bottle Rock Power
Corp., 108 S.W.3d 538, 554 (Tex. App.--Houston [14th Dist.] 2003, no pet.) (declining to stray into
the issue of liability, the court stated that, in deciding the jurisdictional inquiry, "the trial court
should rely only upon the necessary jurisdictional facts and should not reach the merits of the case.").
11. Interests in oil and gas rights, including working interests and royalty interests in oil and
gas leases, are considered interests in real property. See Renwar Oil Corp. v. Lancaster, 276 S.W.2d
774, 776 (Tex. 1955); Trutec Oil & Gas, Inc. v. Western Atlas Int'l, Inc., No. 14-04-00363-CV, 2006
Tex. App. LEXIS 3225, at *9 (Tex. App.--Houston [14th Dist.] 2006, pet. denied) (memo. op.);
MCEN 1996 P'ship v. Glassell, 42 S.W.3d 262, 263 (Tex. App.--Corpus Christi 2001, pet. denied).
12. The news release dated October 15, 1996 stated, "The company is pleased to announce
that Diebel #1 well in Goliad County, Texas has reached its primary target--the 'Basal Massive'
sand in the Wilcox formation . . . . The second well is scheduled to be drilled in approximately 60
days. Forty wells may be required to fully develop the 15,000 acre prospect." A news release dated
October 16, stated, "The Diebel #1 well is the first well in a multi-well program operated by Edco
Energy of Austin, Texas. The company has purchased an 8.5% Working Interest in this well subject
to regulatory approval for $238,404.90 US and 19,867 treasury shares issued at a deemed price of
$2.20 Cdn. The 15,000 acre prospect was generated after a 48 square mile 3-D seismic survey, that
was interpreted by Schlumberger-GeoQuest. . . . Forty wells may be required to fully develop the
15,000 acre prospect."