# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00739-CV

---

**Daniel Maust McReynolds a/k/a McReynoldsCo; and M Terra, LLC, Appellants[1]**

**v.**

**Alma Franco Trucking LLC, d/b/a A. F. Trucking, Appellee**

---

**FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 20-1004-C26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This appeal involves a dispute about nonpayment for trucking services on a construction project in San Marcos for The View, a six-story student-residence building. A jury awarded Alma Franco Trucking, LLC d/b/a A.F. Trucking (AFT) $19,693 on its breach-of-contract claim and $61,686.50 in attorney's fees plus conditional attorney's fees against Daniel Maust McReynolds. McReynolds challenges the legal and factual sufficiency of the evidence supporting the finding that AFT contracted with him individually—rather than his companies, McReynolds Construction, LLC d/b/a McReynoldsCo and M Terra, LLC—and he conditionally challenges the awarded attorney's fees. We will affirm the trial court's judgment.

---

[1] The notice of appeal identifies "Daniel Maust McReynolds a/k/a McReynoldsCo and M Terra, LLC" as appellants, but the trial court's judgment was rendered against only "Daniel Maust McReynolds." McReynolds's brief identifies himself as the only appellant, states that M Terra "is not a party to this brief," and states that M Terra would "very soon file a motion to dismiss its appeal." It did not. Thus, we retain the style of the case from the notice of appeal but address only McReynolds's issues. *See* Tex. R. App. P. 38.1(a).

## BACKGROUND

This case concerned who was responsible for paying AFT for its work. The owner of The View project was Celmark Group, and the owner-representative was Ragu Sada. The parties presented conflicting evidence about others' roles, particularly McReynolds's individual involvement or that of his LLCs in hiring and paying for dirt-hauling truckers.

McReynolds, who holds a law degree, is the sole owner of McReynoldsCo. McReynoldsCo is the sole owner of M Terra, LLC, a dirt-hauling company McReynolds created in February 2019, about a month after the project began. McReynolds testified that McReynoldsCo was the project's general contractor, and that the project had an eighteen-month timeframe for completion. Site preparation was delayed when two subcontractors awarded bids declined to take the job after discovering "who the owner was and who the owner's rep was . . . because they had been stiffed by them." Another subcontractor was unsure when it could start. Two weeks into the project, McReynolds was "panicking," and he formed M Terra. McReynoldsCo then hired M Terra to handle dirt work and site preparation. The dirt work became more technical, "things were accelerating," and McReynolds had never built a building pad, so he looked for a subcontractor to handle the dirt work and the pad.

Nonparty subcontractor Carlos Javier Martinez Varona,[2] who has worked in construction since he was fifteen, owns JM Paving and More, which built the pad for The View. Martinez also provided the dirt-work labor and coordinated the trucks hauling dirt to and from the job site. He testified that "Dan McReynolds" hired him to work at The View, and that "Dan" told him that he would be working for "Dan McReynolds." They had no written contract. McReynolds opined that it was sometimes better not having one. Martinez thought McReynolds

---

[2] We refer to this witness the way the parties do, as Martinez.

was the general contractor at The View because when they met, he said "that he was running the job." Martinez was asked on cross-examination to identify the general contractor *company*:

Q. Who was the general contractor company?

A. Dan.

Q. Was it McReynolds Company—

A. McReynolds.

Q. —LLC?

A. McReynolds, LLC.

Q. Okay. So that's the company that you would have entered into an agreement with, right?

A. Yeah.

Q. Okay. Now, McReynolds Company, LLC, you recognize that's a business— separate business entity correct?

A. Correct.

Payment was the focus of other cross-examination questions to Martinez. Martinez stated that he was paid by "Dan," but he also agreed that he received payment from McReynolds Company, LLC and from M Terra for work at The View. He explained that he made his invoices out to "Dan McReynolds" and when paid, he did not look at the name on the check or ask McReynolds where the money came from or what checks he was using. The invoices Martinez sent were admitted into evidence and list the "Payer Name: Dan McReynolds." There was no documentary evidence of checks from M Terra to Martinez for his work at The View. When hired, Martinez was not informed that he would be working for M Terra. He denied knowing M Terra existed until later, when he was hired to work directly for M Terra on a project in Liberty Hill. Martinez

3

also denied being hired to perform trucking work, and the invoices he created never included any trucking charges.

At one point in June 2019, Martinez called McReynolds from the site because there were no truckers present. McReynolds asked Martinez to find truck drivers. Martinez called Juan Lopez of AFT, a company that hauls sand, dirt, and other materials to and from construction sites. Lopez and his wife, Alma Franco, own AFT, and Lopez also drives a truck for their company. Martinez told Lopez that trucks were needed to haul dirt from the job site, and that he was "working for this guy; you know, his name is Dan; we already did half of the pad, and he paid us right away." Lopez told Martinez that AFT's rate was $80 per load, which included fuel, truck upkeep, and driver costs but excluded material and dump costs.

Martinez called McReynolds, informing him of AFT's rate and that Lopez could be on-site the next day. According to Martinez, McReynolds said that "it was fine, that he will pay him," and Martinez should "[g]o ahead and bring them in so we can start getting everything wrapped up." Martinez denied that McReynolds asked him to hire AFT and have them work for Martinez; rather, McReynolds said that he would pay AFT directly. Consistent with that understanding, Lopez testified that Martinez said Lopez would be paid by "Dan McReynolds." At first, McReynolds testified that he expected the truckers' payment to come from JM Paving, Martinez's company. But McReynolds later testified, "I told him [Martinez] I'd pay."

When AFT began work at The View, its trucks waited for long periods on-site due to delays in getting the dirt ready for hauling off. Lopez called Martinez requesting a rate change from $80 per load to $80 per hour, and he recalled Martinez saying, "Let me talk to Dan." Lopez said Martinez called back a few hours later saying "Dan" had approved the change. AFT completed its trucking work in July 2019. Haul tickets for the hundreds of trips that AFT

4

made between the job site and dump site were admitted into evidence, along with AFT's invoices for that work. McReynolds acknowledged that AFT did the hauling service that it alleged.

Overall, The View project was problematic. Numerous liens were filed against the real property, and McReynolds had regular meetings with owner's representative Sada to discuss the liens.[3] M Terra's certificate of formation was revoked from April until August 2019 for failure to file franchise taxes. Against this backdrop, AFT submitted invoices for its work. Martinez initially told Lopez to make AFT's invoices out to McReynolds, but Martinez later told Lopez that McReynolds wanted them made out to M Terra. AFT initially sent its invoices to Martinez, who forwarded them as McReynolds requested to his bookkeeper, Sara Hopkins. AFT also mailed its invoices to M Terra in Waco. After Lopez obtained McReynolds's phone number from Martinez, Lopez and his wife Franco made several calls to McReynolds that were not returned. Franco testified that AFT's invoices totaled about $40,000. None were initially paid.

In September 2019, Martinez called Lopez reporting that McReynolds was at The View jobsite. Lopez drove there to see McReynolds because AFT had still not been paid for its completed work. When Lopez introduced himself, it was clear that McReynolds knew him as the person with a trucking company that had worked there by the hour. According to Lopez, McReynolds said, "You're the guy who worked by the hour," and "I owe you some money." McReynolds did not tell Lopez that he needed to discuss payment with Martinez instead of McReynolds. After this meeting, Lopez kept calling McReynolds because AFT was still unpaid.

Lopez and Franco enlisted the help of their son, Miguel Lopez, who also worked at AFT. He emailed Hopkins twice, first on August 30 attaching AFT's invoices, and again on

---

[3] McReynolds testified that his embarrassment about liens resulted in him "stretching the truth" when communicating with another owner on a subsequent project in Liberty Hill about a billing-rate issue for trucking services.

September 6 requesting the "payment status." Franco also tried to determine the status of the invoices. She spoke by phone with Hopkins on September 11, who said she had cut a check but would mail it to McReynolds for signature. Franco made several more calls to Hopkins that went unanswered. On September 24, when Franco called from a different number to request payment, Hopkins answered and said she had mailed a check to McReynolds for his signature.

McReynolds texted Lopez on November 6, 2019, that he could bring a check to Lopez's home. He gave Lopez a check for $19,453.00, about half what AFT was owed. Lopez told McReynolds that the amount was incorrect and it was not okay. McReynolds mentioned needing help on a job he was getting in Liberty Hill, but no rates were discussed. Lopez testified that McReynolds said he would pay him in a month. He did not. More than three months later, AFT emailed McReynolds and Hopkins stating that after the $19,453.00 payment, the remaining balance was $19,693.00. No response was received. AFT filed suit alleging, among other claims, breach-of-contract for the unpaid balance owed on The View project.

The jury found in favor of AFT on its breach-of-contract claim against McReynolds.[4] McReynolds filed a motion for judgment notwithstanding the verdict. The trial convened a hearing on the motion and implicitly denied the JNOV motion by signing a judgment consistent with the jury's findings. McReynolds then moved for new trial, which the trial court denied after a hearing. This appeal followed.

## DISCUSSION

McReynolds challenges the legal and factual sufficiency of the evidence supporting the jury's finding that he individually, rather than one of his LLCs, contracted with

[4] The jury rejected AFT's fraud claim against McReynolds and M Terra's counterclaim against AFT for offset, but neither are challenged in this appeal.

AFT.  AFT had the burden of proof at trial on its breach-of-contract claim.  *See McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019) (noting that parties alleging breach of contract have burden of proving existence of valid contract).  When a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, as McReynolds does here, it must demonstrate on appeal that no evidence supports the adverse finding.  *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014).  We view the evidence in the light most favorable to the verdict, crediting evidence that supports the verdict if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not.  *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 794 (Tex. 2020).  We will sustain a legal-sufficiency challenge if the evidence offered to prove a vital fact is no more than a scintilla.  *Graham Cent. Station, Inc.*, 442 S.W.3d at 263.  The final test for legal sufficiency is whether the evidence would enable reasonable and fair-minded people to reach the verdict under review.  *Id.*

In a factual-sufficiency review, we consider and weigh all of the evidence.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (noting distinction between legal- and factual-sufficiency standards, explaining that legal-sufficiency review generally disregards contrary evidence and that factual-sufficiency review weighs all evidence); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).  When a party challenges the factual sufficiency of the evidence supporting a finding on an issue on which it did not have the burden of proof at trial, as McReynolds does here, we set aside the verdict only if the evidence supporting the finding is so weak as to make the judgment clearly wrong and manifestly unjust.  *See Cain*, 709 S.W.2d at 176.  The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony, and it may choose to believe one witness over another.  *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761, 776 (Tex. 2003).

7

**Agency**

McReynolds challenges the legal and factual sufficiency of the evidence supporting the jury's answer to Question 1 of the charge, which asked whether he had an agreement to pay AFT for hauling services for The View and included instructions on agency:

**QUESTION 1**

Did Daniel McReynolds and A.F. Trucking agree that Daniel McReynolds would pay A.F. Trucking $80 per hour to provide hauling services to and from 228 S. Guadalupe St., San Marcos, Texas 78666?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

A party's conduct includes the conduct of another who acts with the party's authority.

Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

Answer "Yes" or "No."

Answer: ___*Yes*___

Disputing the jury's affirmative answer to that question, McReynolds asserts that (1) there is legally insufficient evidence that Martinez possessed actual authority to bind McReynolds

8

individually to an agreement with AFT, (2) there is legally insufficient evidence that McReynolds committed any act or conduct that clothed Martinez with apparent authority to act as McReynolds's agent, and (3) there was evidence presented at trial—which he refers to in nine bullet points—that either conclusively establishes the opposite of the jury's answer to Question 1 or renders any evidence supporting their verdict incompetent. Additionally, McReynolds asserts that the evidence is factually insufficient to support the jury's finding that he individually contracted with AFT to perform services for The View, and that AFT misplaced its reliance on a case holding that invoices to an LLC and checks from an LLC that did not relate to the time when the parties entered into their contract were not evidence precluding a finding of personal liability on the contract. *See Gordon v. Leasman*, 365 S.W.3d 109, 115 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding that evidence was legally and factually sufficient to support jury's finding of liability against individuals, rather than LLC, for unpaid debt to carpenter).

By finding that McReynolds had an agreement to pay AFT for hauling services for The View, the jury implicitly found that Martinez acted as McReynolds's agent. "An agent is a person or entity who (1) is authorized to act for another and (2) is subject to the control of the other." *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 418 n.74 (Tex. 2023) (quoting *Gonzales v. American Title Co.*, 104 S.W.3d 588, 593 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)). An agency relationship, which can be formed by the parties' oral agreement or simply by the parties' conduct, entitles the agent to act on the principal's behalf with the same force and effect as if the principal had performed the act himself. *Community Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017).

Texas courts do not presume the existence of an agency relationship. *Id.* The party making the agency allegation has the burden of proving it. *Id.* Establishing an agency

9

relationship requires showing a manifestation of consent by the purported agent to act on the principal's behalf and subject to the principal's control, together with a manifestation of consent by the purported principal authorizing his agent to act. *Id.*

"Absent actual or apparent authority, an agent cannot bind a principal." *Panté Tech. Corp. v. Austin Concrete Sols., Inc.*, No. 03-10-00059-CV, 2010 WL 3927598, at *3 (Tex. App.—Austin Oct. 7, 2010, no pet.) (mem. op.) (quoting *Suarez v. Jordan*, 35 S.W.3d 268, 272-73 (Tex. App.—Houston [14th Dist.] 2000, no pet.)). "Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess." *Id.* "Actual authority is created through written or spoken words or conduct of the principal communicated to the agent. The existence of an agency relationship based on actual authority may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question." *Id.* (quoting *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549-50 (Tex. App.—Houston [14th Dist.] 2003, no pet.)).

While actual authority is created by words of or conduct by the principal to the agent, apparent authority is created by words of or conduct by the principal to a third party. *Id.* To establish apparent authority, one must show that a principal either knowingly permitted an agent to hold himself out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority. *Id.* A party seeking to charge a principal through the apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe the agent had the authority it purported to exercise. *Id.* Either actual authority or apparent authority will suffice to establish an agency relationship. *See*

*Walker Ins. Servs.*, 108 S.W.3d at 552 (concluding that there was no evidence of actual authority but there was sufficient evidence of agency relationship based on apparent authority).

Here, the jury was presented with two alleged agency relationships: first, AFT's allegation that Martinez was acting in an agency capacity based on McReynolds's instructions to hire truckers on his behalf and second, McReynolds's allegation that he was acting as an agent for one of his LLCs when he made the call to Martinez seeking truckers. The jury agreed that the first agency relationship was established but not the second. The party making an agency allegation has the burden of proving it. *Community Health Sys. Prof'l Servs. Corp.*, 525 S.W.3d at 697. Thus, AFT had the burden of proving its allegation that McReynolds empowered Martinez, in an agency capacity, to hire truckers. But McReynolds had the burden of proving his allegation that he was acting on behalf of a principal other than himself.

The parties' respective burdens of proof on the agency issue affect our legal-sufficiency analysis. To have the judgment reversed and rendered in his favor on his legal-insufficiency argument, McReynolds must show that the evidence at trial conclusively established, as a matter of law, all vital facts in support of his claim that he was acting as agent of a principal. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (stating that party attacking legal sufficiency of adverse finding on issue on which he had burden of proof must show on appeal that evidence establishes, as matter of law, all vital facts in support of issue); *see also City of Keller*, 168 S.W.3d at 814-17 (legal-sufficiency standard).

**Martinez's authority**

Regarding actual authority, Martinez testified that McReynolds asked if he knew any truck drivers and could call them. McReynolds's testimony confirmed this communication:

11

So we had to have had the conversation on how to start and finish the job. Whether it was a phone call and/or on site, I assure you I would have had a conversation with Carlos about getting trucks and we need them here fast because we've got to build the garage. So my answer is, yes, I communicated to Carlos. I said, Find trucks.

McReynolds reiterated, "We had to have truckers, and I asked him to get the truckers." Martinez complied with McReynolds's instruction. He called Lopez of AFT, confirmed AFT's rates and availability, and relayed that information to McReynolds. Martinez testified that McReynolds's response was that "it was fine, that he will pay him," and that McReynolds directed Martinez to "[g]o ahead and bring them in so we can start getting everything wrapped up." Martinez testified that although he coordinated the truckers bringing materials into and out of the job site, coordinating them did not include hiring and paying the truckers directly. Martinez denied that McReynolds asked him to hire AFT and have their truckers work for Martinez; rather, McReynolds said that he would pay AFT directly:

Q. And just to be clear, when you say he would pay him, are you saying Mr. McReynolds was saying—

A. Mr. McReynolds.

Q. —he would pay—

A. Yes.

Q. —A.F. Trucking?

A. Directly, yes, sir.

Additionally, Lopez testified that when he requested a rate change, Martinez did not make the decision but said, "Let me talk to Dan," and Martinez called back a few hours later saying "Dan" approved it. Lopez told the jury that when he met McReynolds at The View,

12

McReynolds said, "You're the guy who worked by the hour," and "I owe you some money." He did not tell Lopez that payment matters should be discussed with Martinez. This was some evidence that McReynolds intentionally conferred authority on Martinez to act as his agent in hiring AFT, and that Martinez did not exceed the scope of his authority in dealing with Lopez.

Further, consistent with the jury's finding in Question 1 that McReynolds agreed to pay AFT for hauling services, McReynolds eventually testified that he was responsible for paying AFT. Initially, when asked whether he expected Martinez's company, JM Paving, to "pay the truckers directly," McReynolds said that as with "every subcontract environment," he would know how much the trucking was, see the rate, and "get a line item for that item, but it would come from JM Paving." McReynolds never told Martinez that Martinez needed to pay AFT because they were Martinez's vendors. McReynolds agreed that if Martinez believed it was his responsibility to both hire *and pay* AFT, there would be charges for AFT included in Martinez's invoices. On the other hand, McReynolds said that if Martinez thought AFT was working for McReynolds, Martinez would have excluded billing for AFT: "[I]f they're not working for him and he thinks they're working for me, he would not include them." McReynolds acknowledged that he had no evidence of Martinez submitting invoices for trucking services. Next, McReynolds admitted that he was responsible for paying for AFT and that he said so to Martinez:

> Q. So if I went over to that white board right there and I wrote out a question and it said, Did you tell Carlos Martinez that you would pay the truckers that he had found to work on The View, and I put a box, one box said yes and one box said no, and gave you a pen and asked you to check one box, which one would— which box would that be?
>
> A. Without any context, I would say, yes, I told him I'd pay.

13

McReynolds later reinforced that testimony:

> Q. Okay. So we're in complete agreement that it was your responsibility to pay A.F. Trucking on the San Marcos project?
>
> A. Once I acknowledged who he [Lopez] was and what he was saying he had done, I told him I was working to pay him for it, and yes.
>
> Q. Okay. I just want to focus on that last part. The answer is yes or—
>
> A. Yes.

The evidence at trial shows that McReynolds's first contact with AFT or Lopez was after AFT completed its work at The View and sought payment. AFT began working at The View after outreach from Martinez. McReynolds would not have been responsible for paying AFT unless he had hired AFT through Martinez, his agent. Based on the summarized evidence, a reasonable jury could have found that McReynolds intentionally conferred authority upon Martinez to hire truckers on his behalf, or that McReynolds intentionally allowed Martinez to believe he had that authority, or that by want of ordinary care McReynolds allowed Martinez to believe he possessed that authority. *See Panté Tech. Corp.*, 2010 WL 3927598, at *3. Thus, there was some evidence the jury could have credited to implicitly find that Martinez had actual authority sufficient to establish an agency relationship and bind McReynolds.[5] *Cf. Walker Ins. Servs.*, 108 S.W.3d at 552.

---

[5] Having concluded that there was legally sufficient evidence to support the jury's implied finding that Martinez had actual authority, we need not reach McReynolds's contention that the evidence was legally insufficient to show that Martinez had apparent authority. *See* Tex. R. App. P. 47.1.

14

**McReynolds's individual liability**

Having concluded that Martinez had actual authority to act as McReynolds's agent, we next consider whether there was legally sufficient evidence showing that when McReynolds empowered Martinez, he did so on his own behalf rather than for one of his LLCs. We conclude that there was. McReynolds had the burden to prove that the evidence "conclusively established" that he was acting as agent for one of his LLCs when he instructed Martinez to "find trucks" and "get the truckers." We conclude that he did not.

The evidence at trial was legally sufficient to establish that Martinez was the agent of McReynolds individually. Martinez testified that when he called McReynolds and gave him AFT's rate, McReynolds said "*he*" would pay AFT. Martinez did not testify that McReynolds told him to find truckers for McReynoldsCo, McReynolds Construction, LLC, or M Terra. Martinez testified that "Dan McReynolds" hired him to work at The View and that "Dan" told him he would be working for "Dan McReynolds."[6] This was some evidence that McReynolds authorized Martinez to act as his agent.

Significantly, if McReynolds intended to not be bound individually, he did not convey that to Martinez. To avoid personal liability, this Court has stated that an agent has a duty to disclose not only that he is acting in a representative capacity but also the identity of his principal. *A to Z Rental Ctr. v. Burris*, 714 S.W.2d 433, 435 (Tex. App.—Austin 1986, writ ref'd n.r.e.); *accord Johnson v. Armstrong*, 83 Tex. 325, 328 (1892) (noting that in verbal contracts, if agent does not disclose his agency and name his principal, he binds himself personally). The party with whom the agent deals has no duty to discover the principal. *A to Z*

---

[6] Only when asked to identify the "general contractor *company*" did Martinez give three answers: "Dan," "McReynolds," and "McReynolds, LLC." After this testimony, Martinez again said that McReynolds told him he would be working for "Dan McReynolds."

*Rental Ctr.*, 714 S.W.2d at 435. If the principal remains undisclosed, or if it is known that a person is acting as an agent, but the principal's identity is not disclosed, the agent is a party to the contract. *Id.* at 435, 436 (concluding that agent who failed to disclose sufficient information about his principal's identity could not avoid personal liability on contracts). "The other party's *actual knowledge* of the principal, not just the other party's suspicion, is the test." *Id.* at 435. The issue of disclosure of the agency relationship is a question of fact. *Nadeau Painting Specialist, Ltd. v. Dalcor Prop. Mgmt.*, No. 03-06-00060-CV, 2008 WL 2777724, at *7 (Tex. App.—Austin July 18, 2008, no pet.) (mem. op.). In determining whether sufficient disclosure was made, we look to the time that the parties entered into the contract. *Id.* This is because knowledge acquired after a cause of action has accrued cannot affect the right to recover from the agent personally on a contract. *Id.*

Here, McReynolds was questioned at length about conversations in which he authorized Martinez to act as his agent. Yet he never testified that he disclosed to Martinez that the principal would be any person or entity other than McReynolds himself. Instead, when asked squarely what he told Martinez, McReynolds testified, "I would say, yes, I told him *I'd* pay." McReynolds remained unclear about exactly which of his LLCs was his alleged principal, and if he was uncertain, the jury may well have found it unreasonable to expect that Martinez had discerned it under the circumstances. McReynolds had no written contracts with Martinez or AFT that could have clarified the identities of the principals and agents involved. And McReynolds—a law-school graduate who has some experience as a strip-mall developer, chain-restaurant owner, tech-support-company owner, and general contractor—opined that it was sometimes "better" to not have a written contract. In his view, it is enough to rely on check

16

payments and submitted invoices with the names of his LLCs as proof that Martinez and Lopez knew, or should have presumed, that he was acting as agent for one of his unspecified LLCs.

But agency is not presumed. *See Community Health Sys. Prof'l Servs. Corp.*, 525 S.W.3d at 697; *Gordon*, 365 S.W.3d at 114. And in *Gordon v. Leasman*, our sister court determined that evidence of invoices to an LLC and checks from an LLC, created after some homeowners and a carpenter had entered into their contract, were insufficient to preclude a finding of the homeowners' personal liability on that contract. 365 S.W.3d at 115. In *Gordon*, a carpenter was hired for work by a homeowner who also owned an interior-design company, IBL Construction and Design, LLC. *Id.* at 112-13. The carpenter testified that when they entered into their agreement, the homeowner did not mention her LLC. *Id.* at 113. The homeowner maintained that at their first meeting, she handed him a business card indicating that she was an interior designer for IBL. *Id.* The carpenter denied receiving the card and testified that his agreement was with the homeowner and said that he was working for her and her husband. *Id.* at 113. A jury resolved the factual dispute in favor of the carpenter and found the homeowners individually liable. *Id.* at 114. Affirming the judgment, the court of appeals concluded that the evidence supported the jury's finding that the homeowner "did not to disclose any agency relationship at the time [the carpenter] and [homeowner] entered the contract" and that the homeowner had entered into the agreement in her individual capacity. *Id.* at 115; c*f. Nadeau Painting Specialist, Ltd.*, 2008 WL 2777724, at *8 (noting that agent disclosed that "each of its four principals would be responsible for payment for any painting services" and that painting company was told before contract formation that three of those four identified principals were in financial difficulty and might be unable to make timely payments).

17

McReynolds argues that *Gordon* is distinguishable and that AFT's reliance on *Gordon*'s holding is misplaced because *Gordon* involved a written contract, there was no dispute that the homeowner had authority to bind her LLC, the court stated that the homeowners were not relieved from a finding of personal liability on the contract "given the evidence to the contrary," and the agreement concerned a couple building their home. We conclude *Gordon* is sufficiently analogous to offer guidance here.

McReynolds also argues that under *Johnson v. Armstrong*, a summary judgment involving a dispute between a university president and architects who were designing plans for a university building, the burden was on Martinez to question whether McReynolds was acting in his individual capacity (and speaking truthfully when saying that he would pay AFT). *See* 83 Tex. at 328. We disagree. In *Johnson*, there was "no evidence that Johnson bound himself expressly to pay plaintiffs for their work"; the architects "clearly appear[ed]" to know that the building was intended for public use and not for a private purpose; and the Court ruled that the architects were put "upon inquiry" under circumstances of the transaction that were known to them but "unnecessary for [the Court] to enumerate," resulting in remand of the case. *Id.* By contrast here, the jury has already resolved the disputed fact issues as to notice of McReynolds's agency allegation, and there was evidence at trial concerning McReynolds's responsibility for payment to AFT on a project that did not involve a public building. When asked what he told Martinez, McReynolds testified, "I would say, yes, I told him *I'd* pay." Martinez likewise testified that McReynolds said "*he*" would pay AFT. Thus, on the evidence presented in this trial, the jury could have reasonably found that by opting not to disclose that he was acting in a representative capacity and not to identify his LLC principal by some means, whether in a phone

18

call or a written contract, McReynolds showed that he intentionally, or by want of due care, allowed Martinez to believe that he was an agent acting for McReynolds as an individual.

Lastly, McReynolds points to nine bullet points of "conclusive evidence," that in his view establish his actions were undertaken as agent for one of his LLCs. However, five of the bullet points address events that are immaterial because they occurred after contract formation.[7] Two other bullet points refer to evidence that was contradicted by other evidence and thus, not conclusive.[8] And the last two bullet points are not bases for reversal of the jury's verdict.[9] McReynolds had the burden to prove that the evidence "conclusively established" that he was acting as agent for one of his LLCs when he instructed Martinez to "find trucks" and "get the truckers." He failed to meet that burden. We conclude that the evidence was legally

---

[7] These bullet points refer to AFT sending email to domains of "mcreynoldsco.com" or "mterrallc.com," emailing requests for payment to McReynoldsCo, requesting certain handling of invoicing and payment by McReynoldsCo, and state that JM Paving and AFT received payments from M Terra, none of which concern the relevant time period for the agency-relationship analysis. *See Gordon v. Leasman*, 365 S.W.3d 109, 115 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Nadeau Painting Specialist, Ltd. v. Dalcor Prop. Mgmt.*, No. 03-06-00060-CV, 2008 WL 2777724, at *7 (Tex. App.—Austin July 18, 2008, no pet.) (mem. op.).

[8] These bullet points note that Martinez testified that JM Paving was hired by the general contractor to work at The View, and that the evidence showed the general contractor was McReynolds Construction LLP d/b/a McReynoldsCo, but overlook his testimony that McReynolds "hired me, not my company." Moreover, there is no argument addressing how this establishes that McReynolds was acting on behalf of one of his LLCs. *See* Tex. R. App. P. 38.1(i). The relevant inquiry is who Martinez's principal was, not the identity of his employer, and both Martinez and McReynolds testified that McReynolds asked Martinez to hire truckers; there was no mention of any other entity to act as principal.

[9] These bullet points state that AFT presented no evidence that McReynolds did business as McReynoldsCo. and that AFT had no communication with McReynolds until weeks after AFT completed its work at The View. The argument for these bullets is unclear. *See id.* Having an assumed-name certificate does not relieve an agent of his "duty to disclose the name of his principal." *See A to Z Rental Ctr. v. Burris*, 714 S.W.2d 433, 435 (Tex. App.—Austin 1986, writ ref'd n.r.e.). And McReynolds's lack of communication with AFT is irrelevant because he told Martinez to find trucks and hire truckers under terms to which McReynolds agreed, and McReynolds did not require any particular truckers.

sufficient to establish that McReynolds was acting in his individual capacity when he vested Martinez with actual authority to act as his agent.

Further, having viewed the evidence in the light most favorable to the jury's verdict, and crediting the evidence that reasonable jurors could in support of that finding, we conclude that more than a scintilla of evidence was presented at trial supporting the jury's affirmative answer to Question 1, finding that McReynolds had an agreement to pay AFT for hauling services for The View. As the sole judge of the credibility of the witnesses, the jury could have reasonably chosen to believe Martinez's and Lopez's testimony and discounted McReynolds's contrary evidence. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761, 776. Thus, we conclude that the jury's verdict was supported by legally sufficient evidence.

Likewise, after considering and weighing all the evidence, we cannot conclude that the judgment is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we conclude that the trial court's judgment is supported by factually sufficient evidence. We overrule McReynolds's evidentiary-sufficiency issues.[10]

## CONCLUSION

We affirm the trial court's judgment.

_____
Darlene Byrne, Chief Justice

---

[10] Because we have concluded that the evidence was legally and factually sufficient to support the jury's verdict against McReynolds, we need not reach his conditional challenge to the attorney's fees awarded on AFT's breach-of-contract claim. *See* Tex. R. App. P. 47.1; *see also* Tex. Civ. Prac. & Rem. Code § 38.001(8) (authorizing recovery of attorney's fees for valid claims based on oral or written contract).

20

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   November 26, 2025